## WARNER v. MARSHALL ET AL.

[No. 20,433. Filed October 6, 1905. Rehearing denied February 14, 1906.]

1. CONTRACTS. — *Real Estate.* — *Description.* — *Application of.*— *Question of Fact.*—The application of the description of land to its subject-matter is a question of fact for the jury. p. 93.

2. TRIAL.—*Special Findings.—Failure to Include Contract.—Specific Performance.—Quieting Title.*—Where the special findings, in a suit for specific performance and to quiet title, fail to

show material parts of the alleged contract for the conveyance or the real estate in question, the plaintiff can not complain that the conclusion of law against her is erroneous. p. 93.

3. APPEAL AND ERROR.—*Bill of Exceptions.—Filing.*—A bill of exceptions, presented to the judge within the time granted for the filing thereof, but filed after the expiration of such time, is a part of the record. *La Rose* v. *Logansport Nat. Bank*, 102 Ind. 332, disapproved. p. 93.

4. TRIAL.—*Special Findings.—Contracts.—Specific Performance.* —A finding that plaintiff took care of decedent until decedent's death; that decedent in her petulancy several times asked plaintiff to leave; that plaintiff refused to do so but patiently bore such remarks; that decedent each time became sorry of the language used and asked plaintiff to remain, shows that plaintiff performed her contract to care for decedent during decedent's life. p. 102.

5. EVIDENCE.—*Declarations.—Res Inter Alios Acta.*—In a suit for specific performance of a contract to care for decedent during her life, in consideration of the conveyance of certain real estate, the declaration of decedent to third persons that plaintiff was not satisfied with decedent's will is *res inter alios acta* and inadmissible as evidence of the fact of such dissatisfaction. p. 103.

6. CONTRACTS. — *Offer.* — *Acceptance.* — *Correspondence.*—Where an open offer to contract is made by letter, a continuation of the intention to contract is presumed until an acceptance closes such offer. p. 104.

7. SAME.—*Offer.—What Constitutes.*—To determine whether a proposal contained in a letter is an offer to contract, the terms of such proposal and the circumstances of the parties are to be considered. p. 104.

8. SAME.—*Offer.—Promise.*—A letter to plaintiff by decedent stating: "I have had my house painted since I came home. * * * You know it is to be yours if you survive me and the lots which is property worth at least $10,000, but * * * I shall expect you to come and compensate me by staying while I need you," constitutes a legal offer to contract. p. 104.

9. SAME.—*Offer.—Acceptance.*—Where decedent in a letter made a certain offer to plaintiff, and plaintiff, in a letter, replied: "I subscribe to the terms," a valid contract is created. p. 106.

10. SAME. — *Executed.* — *Acceptance.* — *Estoppel.* — Decedent's privies are estopped from asserting that plaintiff never accepted decedent's offer, where it is shown that plaintiff fully performed the terms of the offer, with decedent's knowledge and consent. p. 106.

11. DEEDS. — Description.—Construction.—Descriptions in deeds are construed with the utmost liberality, and if by any possibility the intent can be gathered from the words used, such intent will be given effect, the office of a description being to furnish the means for identification of the lands. p. 107.

12. EVIDENCE.—Parol.—Deeds.—Descriptions.—Parol evidence is admissible to apply the description in a deed to the subject-matter. p. 107.

13. CONTRACTS.—Correspondence.—Frauds, Statute of.—Where decedent and plaintiff carried on a correspondence beginning in March, 1897, and culminating in an offer on August 1, 1897, and an acceptance on August 15, 1897, the court may look to such prior correspondence to determine the subject-matter of such offer. p. 108.

14. SAME.—Correspondence.—References.—Frauds, Statute of.— Evidence.—Where prior letters are relied upon to explain ambiguities in a written offer, the letter or writing containing such offer must in some manner refer to such prior letters. p. 109.

15. SAME. — Correspondence. — References.—Evidence.—Parol.— Frauds, Statute of.—Where the reference to prior letters contained in a letter embodying an offer is very general or indefinite, parol evidence is admissible to identify the letters referred to. p. 109.

16. SAME.—Reference to Other Writings.—Frauds, Statute of.— Evidence.—Where a writing containing an ambiguous offer does not contain a direct or express reference to other writings explanatory thereof, other writings, if, in the light of the facts and by comparison, they are connected therewith, may be admitted; and a general reference may be inferred to relate to the only writing produced by either party. p. 109.

17. SAME. — Correspondence. — References.—Ambiguities.—Parol Evidence.—Where decedent wrote to plaintiff that she would convey to her "the three lots in this half block that your uncle traded for," further speaking of the property as "this nice house," and "the rest of this piece of property," in consideration of plaintiff's taking care of decedent the remainder of her life, which offer was not in terms accepted; and in a later letter offered "the lots," according to "our understanding," which offer plaintiff in terms accepted; and parol evidence showed that decedent meant the "Holden property" which constituted the three lots and house first mentioned, such real estate is sufficiently identified. p. 110.

18. SAME. — Conveyances. — Description.—Partly False.—Where decedent wrote to plaintiff: "You know it [the house] is to be yours if you survive me and the lots which is property worth

at least $10,000," the prior correspondence will be admitted as explanatory thereof, and if there be a conflict between the value of the property intended and the value as given, the court will reject, as the least certain, the description as inferred from value.   p. 111.

19.   CONTRACTS.—*Real Estate.*—*Description.*—*Values.*—Where decedent, by letter, offered plaintiff, for a consideration, "the three lots in this half block that your uncle traded for," further saying that it "includes this nice house" which plaintiff should "take good care of," and later wrote:   "You know it [the house] is to be yours if you survive me and the lots which is property worth at least $10,000," such latter statement is capable of the construction that "which" refers to the lots and not to the house and lots, other circumstances also indicating that as the true interpretation.   p. 112.

20.   SAME. — *Ambiguities.* — *Explanations.*—*Evidence.*—Where a letter contains an offer, ambiguous on its face, which is certain when viewed in the light of testimony legally admissible, the acceptance of same constitutes a valid contract.·   p. 114.

21.   EVIDENCE. — *Oral.* — *Contracts.*—*Dispositive.*—*Contradiction of.*—A contract by which decedent undertook to convey to plaintiff certain property for services, is dispositive in character and cannot be varied nor contradicted by parol.   p. 115.

22.   SAME. — *Oral.*—*Contracts.*—*Explanations.*—Oral evidence is admissible to clear up indefiniteness or ambiguity in a written contract, but the plain meaning of the language used can not be varied by parol.   p. 116.

23.   SAME.—*Circumstantial.*—*Inferences.*—Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must first be proved, since reliable inferences cannot be drawn from uncertain inferences.   p. 117.

24.   SAME. — *Parol.* — *Contracts.* — *Variation.*—*Inferences.*—Evidence of plaintiff's declaration that she claimed the corner house and the lot north does not justify an inference that she claimed only a portion of the large unplatted lot north, since inferences cannot be based upon inferences.   p. 118.

25.   SAME.—*Contracts.*—*Wills.*—*Intention.*—*Self-Serving Declarations.*—Where decedent contracted with plaintiff on August 1 to convey to her certain lots, a will executed by decedent three days afterward, wherein she devised plaintiff only a part thereof, is inadmissible to show the decedent's intention in the making of such contract, the expressed intention in the contract governing; and the admission of such evidence is also objectionable as hearsay.   p. 118.

26. SPECIFIC PERFORMANCE. — Contracts. — Terms. — Where the terms of a contract for the conveyance of real estate are such that the court can identify the property, specific performance will be decreed in favor of the party who has fully performed his part of the contract of purchase. p. 122.

27. SAME.—Contracts.—Consideration.—Where plaintiff agreed to take care of her aunt during her life, and did so, the fact that the aunt lived only a little over three years does not prevent plaintiff's right to specific performance of their contract for the conveyance of real estate, the breadth of the undertaking at the time of its execution being the measure of plaintiff's obligation. p. 122.

28. APPEAL AND ERROR.—Final Judgment.—Where the facts of a case show clearly that the plaintiff in an equity case ought to recover, a final decree will be directed. p. 123.

From Vigo Circuit Court; *Jere West*, Special Judge.

Suit by Sarah G. Warner against Buena V. Marshall and others. From a decree for less than prayed, plaintiff appeals. Transferred from Appellate Court under §1337u Burns 1901, Acts 1901, p. 590. *Reversed, and decree directed for appellant.*

*R. B. Stimson* and *A. C. Harris*, for appellant.

*John G. Williams, Buena V. Marshall* and *Lamb, Beasley & Sawyer*, for appellees.

GILLETT, J.—Suit by appellant to enforce specific performance of an alleged contract for the conveyance of real estate, and to quiet title. The property involved consists of the south three-fourths of the east half of out-lot sixteen of the town (now city) of Terre Haute. The land has a frontage on Fifth street extending north from Eagle street a distance of two hundred twenty-five feet and nine inches. The court below made special findings, and stated a conclusion of law in appellant's favor as to the south sixty-six feet of said property. As to the balance of said property, the court's conclusion was adverse to her.

The question is before us as to the correctness of the latter conclusion, and we are also called on to determine whether,

under the evidence, appellant was entitled to such findings as would have required the stating of a conclusion of law in her favor as to the entire property.

It is insisted by appellees' counsel that the question of the application of a description of land to its subject-matter is one of fact, and that the findings do not show that appellant was entitled to any more of the real estate than was awarded to her. Counsel for appellees are correct in their first proposition (1 Jones, Real Prop. in Conveyancing, §339; *Steigleder* v. *Marshall* [1893], 159 Pa. St. 77, 28 Atl. 240), and, as it does not appear that the findings contain the entire negotiation and correspondence relative to said real estate, we hold that appellant is not entitled to complain of a conclusion of law in appellees' favor as to the remainder of the property.

Before passing to the question of the evidence we are required to consider the contention of appellees' counsel that the evidence is not in the record. This contention is based on the fact that it appears that the general bill of exceptions was filed three days after it was signed, and that the date of the filing was not within the time allowed by the court. Under the present practice it is not only the duty of the court or judge to sign the bill, but to "cause it to be filed." It was held in *La Rose* v. *Logansport Nat. Bank* (1885), 102 Ind. 332, upon a state of facts in regard to a bill substantially similar to that which is here involved, that the evidence was not in the record; but this holding was condemned in *Robinson* v. *Anderson* (1886), 106 Ind. 152, as involving too narrow a construction of the statute. Mitchell, J., speaking for the court, said: "When a party objecting has presented his bill of exceptions in proper form, within the time allowed, he has complied with the letter and spirit of the statute, and

. ..

is entitled to the benefit of his exceptions." It was said by this court in *Vincennes Water Supply Co.* v. *White* (1890), 124 Ind. 376: "When a party entitled to a bill of exceptions tenders the proper bill within the time allowed by the court he has done his whole duty, and the duty of signing and filing then remains with the judge." See, also, *Creamer* v. *Sirp* (1883), 91 Ind. 366; *Hamm* v. *Romine* (1884), 98 Ind. 77; *McCoy* v. *Able* (1892), 131 Ind. 417; *Smith* v. *State* (1896), 143 Ind. 685; *Robinson* v. *State* (1899), 152 Ind. 304. We hold that the evidence is before us.

The facts, as they appeared upon the trial, are as follows: In 1849, Cephas S. Holden traded for the real estate in controversy by the description first above given. He died intestate some three years later, the owner of said property, leaving his widow, Mary F. Holden, and their four children surviving him. The children died in youth, and said Mary F. Holden acquired their interests by inheritance. She afterwards married one Langford, the relation continuing until his death, which occurred in 1896. Mrs. Langford improved said property by building four houses upon it, and, during her later years, she had a considerable estate aside from that. She died in 1901. For some years preceding her decease she resided in the south house on said property, and she had for a housekeeper an aged and infirm woman, Mrs. Ludlow. In her later years Mrs. Langford was without near relatives. She was laboring under the burden of age, and had a number of ailments. During the year after her husband's death she was very lonely and sorrowful. In the summer of 1896 she visited appellant, a niece of Cephas S. Holden, who lived in Colorado, and supported herself and invalid mother by teaching and painting. During the spring and summer of 1897 there ensued the following correspondence between them:

"Terre Haute, March 15, 1897.

Dear Sarah:

I am glad to hear that you and your mother are both well. I expected every mail that come that the sad news would also come too, but the Great Father did not so design it. Oh, Sarah, I do not want to disappoint you, but am rather fearful of the journey, and also of being without a physician there, and we coming in there so entirely new to us that it will not be safe for us now at Georgetown. I was obliged to have a doctor twice as my heart was so affected. I was fearful that I could not do without one at Grand Lake. Would so much like to be with you and your mother at Grand Lake, at least a large part of the time, if not all. * * * You can not miss your husband, who lived with you so short a time, compared with mine, who lived with me some thirty-three years, nearly a life time, but who I must learn to live without now. Well, let me change the subject. The Young Men's Christian Endeavor Society of this part of the world are intending to get up an excursion to San Francisco for about $50 the round trip, with the privilege of a three months' stay there, in July, if I am not mistaken, and I have some two or three families there that are, writing me to come there and visit them. Now I have always wanted to see California and so many claim for it healthfulness equal to Colorado. * * * I would so much like to have you go on from Colorado with me, if I decide really to take the long trip. Well, if I was sure California would benefit me as much as Colorado did last fall I would not hesitate a moment. Sarah, I wish you to remember what I told you last summer, that the three lots in this half block that your uncle traded for are to be yours if you survive me, and I will deed them to you if you will come and live here and care for me and help me while I shall need your care and comfort. It includes this nice house that I want you to take good care of, but I think you deserve it more than any one else living, and, with the rest of this piece of property, will make a rich provision for you, so you will not need to teach. I shall not expect you to come while your mother needs

your care and support, but I wish some of her other five children would offer her a home, so you might come soon; for I need you and I am so lonely and weak, and Mrs. L. is feeble too. * * * Now will close with love and best wishes, and remain, as ever,

Yours truly,
From your aunt,
Mary F. Langford."

"Grand Lake, Colorado, March 30, 1897.

My Dear Kind Aunt:

Your welcome letter was received last week. I was glad to hear from you, but a little sorry that you might give up spending the summer and longer with me here. Yet I can not blame you for not liking the idea of being so far from good, well-educated practical physicians. * * * I have been thinking of that good society's trip to California next summer from your place, and, as you wish, would be glad to join you and go, too, from Denver, especially if you feel that I could be of real service to you. I, for years, have wished to see that beautiful state, and intended to go the first opportunity I had to do so. I also would be glad to meet and make the acquaintance of the good people of Terre Haute that I trust would compose the company, such as are your true friends, at least since you again revealed to me the fact that I might some day have the old home property that you have improved, and the nice house in Terre Haute. I often find myself thinking of that place with a growing love; the beautiful spot where you have dwelt so many years, and your dear loved lost ones blossomed for a time, then left earthly for eternal joys. Such dear associations make the place dear and sacred to me, and, indeed, it will ever be, if I live to possess it, and I hope and pray that I may ever regard you with the truest and deepest gratitude, and, if ever nearer duties do not claim me, go to you and do for you everything in my power truly to bless you, and try to carry out your wishes while you live; and, should I remain on earth longer than you, to carry out the same, so far as you express them, through my life. I feel that guarding

and nuturing the buildings, trees, plants, etc., that you have reared and tended would be a double duty to me and you, and not forgetting the one who so kindly regarded me in the giving, and to also visit with flowers the tomb of the dear loved ones whose bodies are there consigned to Mother Earth. Aunt, there is not a day or a half a day that I do not think of Eugene as my kind brother-like cousin of my early childhood, and of your Sarah as the sweetest of my girl cousins. Her ways were so noble and gentle. All the joys and blessings she would have had I shall regard as precious to me, I promise you.

Lovingly yours,

Sarah."

"Terre Haute, June 23, 1897.

Dear Niece:

Your letter containing the sad news is at hand, and contents noted. While she that has departed has lived her full time out, we can not refrain from shedding the briny tear, as we feel that she can never return to us, though the time will come ere long that we may go to her, the thought of death to me is always sad. Though I was not taken by surprise when the sad news reached me, for I was expecting it. Mrs. Ludlow has not been in good health for some months, and is looking bad, worse than I ever saw her. Her teeth have been ulcerating for a long time, but she had one extracted yesterday and it seemed to have given her a little relief. We are boarding, and have been since we got home, as she did not seem well enough to do our little house work. * * * Now when you get all your arrangements made, I shall expect you to come here to make your home. I should be only too glad could I see my way clear to come to Denver this summer again. I had intended to, but all seems against it. The city are not [now] putting me to the cost of between $2,000 or $3,000, and I consider it as good as thrown away, for the houses will neither rent nor sell for more when done, and then I do not get the kind of paving we want either. And so much unnecessary expense. We did not have any need of asphalt paving,

as our streets are so sandy they are never muddy much. * * * Do you still intend to attend the normal school? Several of the students went home sick. It seems that I can not find much to say this time. Yours with love and sympathy.

Lovingly yours,<br>M. F. Langford."

"Terre Haute, July 4, 1897.

Dear Sarah:

I have written to you once since the death of your dear mother. Did it reach you? * * * Do you think you can sell your houses there, or what will you do with them? And are you a good mathematician, and if so, why do you think it 'necessary for you to attend the normal school now? * * * And when do you think you will be ready to come, or will you wait until the hottest weather is over? And how are you off financially? * * * Well, Mrs. Ludlow is not very well, and has not been for a considerable length of time. And as for myself, though not well, am considerably better than I was last spring. Must close with love and sympathy.

Mary F. Langford."

"Terre Haute, August 1, 1897.

My Dear Niece:

I sit down this hot morning to write you a short letter. * * * Oh how I wish I was in Denver now, but there is no hope, scarcely any change when I am compelled to throw away about $3,000 to satisfy the greed and ignorance of the men that our city claims as intelligent voters, and the ones they put in power. * * * I have had my house here painted since I came home, and so many say it looks better now than it ever did before. You know it is to be yours if you survive me and the lots which is property worth at least $10,000, but as your mother is now dead I shall expect you to come and compensate me by staying while I need you. Mrs. Ludlow is not in very good health. I do not wish you to inform your sisters or brothers or anyone of our understanding in this at present. Times are so hard, have never had so many

vacant houses, and so long vacant as now, in my life before. Rents are away down too, and if people are dishonest they will not pay their rent; then low rents or none at all and lost time and having so much destruction of it when in use consequently cost to repair makes me sad to think of it, and then the percentage for collecting to add to it. If I could only attend to that myself I could save that much, but I can not do it. You say you wish to remain there until the heated season is over. I would not wish you here now, as I should fear you would be sick, as your whole life has been spent in cooler climates, but when it is safe to make the change.

Lovingly yours, by your auntie,

Mary F. Langford."

"Grand Lake, August 15, 1897.

My Dear Aunt Mary:

Yours of August 1 was duly received, and has been neglected, longer than I intended. I have not time to make a long reply now, as I am busy as ever or more so; but I presume you are looking for a message. I thank you for your kind assurance or promise to me of a future reward, and I subscribe to the terms. I shall try to deserve it all, and will come as soon as I can get necessary business attended to here. I presume you will let me collect some to pay my current expenses, as you mentioned last year, and to take up a little normal work when you can well spare me; but I will not neglect you to do so, but I certainly would appreciate the opportunities that Edna gave up, if I had them. I will try to comply with your wishes, so far as you have expressed them, about the matter. I do feel sorry for you. This is the place to summer and escape the intense heat you endure, and I hope you will be able to come to the 'Rockies' hereafter to summer, and not be taxed as you have been of late.

Yours lovingly,

S. G. Warner.

P. S. I have some painting of pictures to do—much of it that I might do now during the tourist

season—but I will only try to fill orders that I have already promised, but I dearly love the work. Hoping that you are better than you were and kindly cared for by a loving Father.

Sincerely,
Sarah."

Out-lot sixteen, as laid out, had no interior lot lines, and it was never platted, but in an atlas, published in 1874, which is shown to have been in the home of Mrs. Langford, there is a plat of said city, wherein the east half of said block appears to be divided by lines running east and west into four lots of equal size. This fact was known to her at least as far back as 1887. It will be observed that in her letter first above set out she refers to the property in controversy as consisting of three lots. The fourth or north lot in the block she acquired from a third person, and caused it to be separately enclosed. From Eagle street north to said last-mentioned lot there was no fence or other physical indicia of division between the houses. Many years before the Holden residence had stood in the center, north and south, of the real estate which is here involved, and it afterwards was the habit of Mrs. Langford to refer to said real estate as the Holden home property. There is no evidence as to the value of said real estate in 1897, but witnesses called by appellees testified that it was worth (presumably at the time of the trial) from $21,560 to $22,060, said south house and sixty-six feet of ground being valued by said witnesses at from $7,460 to $7,900. August 3, 1897, Mrs. Langford made a will devising to appellant said sixty feet of land, and no more. As soon as she could arrange her affairs in the West, and but a short time after the exchange of said letters, appellant came to Terre Haute, and took up her residence with Mrs. Langford, and they continued to live together until the death of the latter.

It appears from the evidence that Mrs. Langford had the house where she lived painted in the spring or early summer

of 1897. She did not have any other house painted between the time she returned from the West and the fall of 1897. There is a great deal of testimony in the record as to the declarations made by Mrs. Langford during the years from 1897 to 1900 of her purpose to deed the Holden. home property to appellant, or to "make her heir to it," in return for her services. To one witness she explained in 1898 that the real estate she intended to deed to appellant was property "Mr. Holden bought for a home; it consisted of three lots and four houses." Mary M. Patterson, an aged witness, who visited Mrs. Langford in 1897, testified that at that time said decedent told her that appellant "was going to stay with her as long as she lived," and that she (Mrs. Langford) intended to make appellant "heir to the Holden part of the estate." Another witness (Mrs. Boudinot), a woman eighty-seven years old, testified that in the fall of 1897, shortly before appellant came to Terre Haute, she said to Mrs. Langford that she ought to have a nurse, "and," quoting the words of the witness, "she said: 'I am going to. I have sent for my niece, and she is coming. I have wanted her to come for a good while, but she had a mother and could not leave; but her mother is dead and she is coming to live with me as long as I live.' And she says: 'I intend to repay her for her kindness; that she shall have the Holden property.' That was her words."

In August, 1899, Mrs. Langford executed a second will, revoking the will of August 3, 1897, and devising appellant a house and lot which was not a part of the Holden homestead. She omitted, by will or otherwise, to fulfil, in whole or in part, the promise in her letter of August 1, 1897.

There is much evidence showing the faithful service which appellant rendered Mrs. Langford during the remaining years of the latter's life. For a time appellant attended school for a short time each day, as they had planned, but at the beginning of the third school year she gave up that work, at Mrs. Langford's request. The latter often

referred to appellant as having been a daughter to her, and said that she did not know how she could get along without her. It is true there is testimony of her having made complaints to others concerning appellant, but these complaints, so far as sifted down, appear to have been those of a querulous invalid. Appellees' evidence shows that Mrs. Langford was very exacting, and that one of her complaints was that appellant was deceitful, since she had failed to resent words spoken to her by Mrs. Langford for the purpose of making her angry. Particularly upon the question of faithful service upon the part of appellant, but partially as evidence of Mrs. Langford's purpose in the correspondence above set out, attention may be called to a letter written by her September 24, 1899, to Mary M. Collins, in which are found these words:

> "Sarah does not attend the normal this fall, for I have told her she will never need to teach, as I promised her property that will bring her more than her teaching, if she stays with me while I live. It is property that came to me by her uncle. As she has shown me more love and attention than any of the Holdens now living, I feel she deserves it."

The finding of the court below on the subject of performance is: "That the plaintiff's mother died in June, 1897, and the plaintiff, as soon thereafter as she could make the necessary arrangements, to wit, on December 20, [September (?)], 1897, came to the house of said Mary F. Langford, and there lived and cared for, and helped and comforted her until her death, on February 11, 1901, and in all respects fully performed the conditions required of her in said letters above set out. Mrs. Langford, without any cause on the part of the plaintiff, became dissatisfied with the plaintiff, and the companionship was not congenial or satisfactory to said Langford, and at different times before her death she asked the plaintiff to leave her and return to her home in Colorado, but the

plaintiff refused to return to her home, and patiently bore with said Langford, and said Langford at each time would become sorry of the language she had used, and would then become anxious that said plaintiff remain with her, and the plaintiff, knowing and understanding her disposition, paid no attention to her dissatisfaction, and remained with her until her death, patiently performing and doing the duties required of her." This finding represents a successful effort to reconcile the whole evidence on the subject of performance, and as the motion for a new trial and the assignment of errors based on the overruling of the same brings the case before us for final disposition, should the evidence warrant it, we hold (and that without hesitation in the light of the finding below) that the question of performance must be solved against appellees.

Evidence was offered by appellees that Mrs. Langford complained to others that appellant tormented her because she did not change the will of 1897, and a witness 5. testified that Mrs. Langford said to her that Sarah (appellant) was not satisfied with the will; that she wanted the well. The well was some eight or ten feet south of the second house, and was not on or near a lot line, were the property divided into three equal lots, as appeared in the atlas. It may be suggested in this connection that the declaration of Mrs. Langford was not evidence that appellant was in fact making any such claim. Indeed, the declaration was strictly *res inter alios acta*. A witness on behalf of appellees—one Smallwood, a clerk in the office of the attorney who prepared the second will—testified that some two or three weeks before Mrs. Langford died, and also shortly afterwards, appellant made the statement to him that she was to have the property on the corner and the lot north. As to the latter words, the witness stated that he inferred that appellant meant the unoccupied space of forty-two feet immediately north of the south sixty-six

feet. He admits, however, that she said she had letters to show for her claim.

It is well settled that a valid contract may be entered into by correspondence. If an offer be made by letter, it is a legal intendment that the offer is constantly repeated, or, in other words, it is presumed that there is a continuation of the intention to contract, until the time when the contract may be closed by an acceptance. 1 Chitty, Contracts (11th Am. ed.), 15. When the person to whom a proposal is made duly signifies his assent thereto, the proposal becomes a promise. Pollock, Contracts (1st Am. from 2d Eng. ed.), *6. In determining whether a letter contains a proposal, in the sense in which that word is used in the law of contracts, it is to be considered whether the terms in which the alleged proposal was made were such, in view of the circumstances connected therewith, as to warrant the other party in acting on it as on a real and intentional offer. 9 Cyc. Law and Proc., 276. We have in Mrs. Langford's letter of March 15 a statement of her willingness to deed the property in controversy to appellant upon the condition named therein, and the only reason for regarding the proposition as tentative was the writer's recognition of the fact that her plan could not be consummated while the mother of appellant had need of her. Answering this letter, appellant revealed her appreciation of the proposal, and expressed her willingness to accept, when circumstances permitted, by the words:

"I hope and pray that I may ever regard you with the truest and deepest gratitude, and, if ever nearer duties do not claim me, go to you and do for you everything in my power truly to bless you, and try to carry out your wishes while you live."

On June 23, 1897, appellant's mother was dead, and Mrs. Langford writes:

"Now when you get all your arrangements made, I shall expect you to come here to make your home;"

and she asks:

"Do you still intend to attend the normal school?"

It is evident that at the time this letter was written the writer looked forward with confidence to the consummation of her plan. In her next letter she asks:

"Do you think you can sell your houses there, or what will you do with them? And are you a good mathematician, and if so, why do you think it necessary for you to attend the normal school now? * * * And when do you think you will be ready to come, or will you wait until the hottest weather is over? And how are you off financially?"

Then comes the letter of August 1, in which Mrs. Langford says:

"I have had my house painted since I came home, and so many say it looks better now than it ever did before. You know it is to be yours if you survive me and the lots which is property worth at least $10,000, but as your mother is now dead I shall expect you to come and compensate me by staying while I need you. * * * I do not wish you to inform your sisters or brothers or any one of our understanding in this at present. * * * You say you wish to remain there until the heated season is over. I would not wish you here now, as I should fear you would be sick, as your whole life has been spent in cooler climates, but when it is safe to make the change."

Tested by the standard which we have stated above, it will not do to say that the letter of August 1 did not amount to an offer. The writer held out a promise, attaching a condition thereto which meant to the other the abandonment of her place of residence and employment, and the taking up of the burden of ministering to an aged invalid for an indefinite period. To treat a proposition like the

one under consideration, after it had been acted on, as not having been intended to affect rights, would be to impute to the writer an intent to mislead.

9. As to the matter of acceptance, it will be observed that appellant, after expressing her thanks for the "kind assurance or promise," says:

"I subscribe to the terms, and will come as soon as I can get necessary business attended to here."

True, appellant speaks of her assumption that she may be permitted to do some collecting to pay current expenses and to take up a little normal work; but she writes as though these matters were understood, and as there was such a clear expression in her first letter of her desire abundantly to perform her part of the engagement, coupled with the assurance in her last letter that she would not neglect Mrs. Langford and would try to comply with her expressed wishes in the matter, we can not think that their minds were apart at that time.   It seems evident that there was no intent to postpone acceptance to negotiate further concerning the matters referred to, but rather to leave them to the reasonableness of Mrs. Langford, and therefore a present acceptance must be presumed.   We may also say that the small liberties asked would not impinge upon the terms of Mrs. Langford's proposal.   There is nothing in the letters to indicate that appellant was to come as a bond servant.   On the contrary, it is evident that the elder woman contemplated that appellant should have some time to herself, that she should come as a social equal, and that she should take her place in the household as if she were a daughter, having both the privileges and the responsibilities which a due sense of the appropriate would suggest.

10. Besides, it may be suggested that appellant having performed, appellees, who stand in the place of Mrs. Langford, ought to be regarded as estopped from raising any question as to the meeting of the minds.   The case is one of a proposal acted on, and this, in the circum-

stances, ought to be regarded as a sufficient acceptance. 9 Cyc. Law and Proc., 257, 270.

It is insisted by appellees' counsel that the only offer which was accepted was the offer in the letter of August 1, and that said letter can not be made the basis of an 11. agreement concerning the property described as "the lots," for the lack of a sufficient description. In *Key* v. *Ostrander* (1867), 29 Ind. 1, 6, this court appropriated as a part of the text of its opinion the following statement from the case of *Peck* v. *Mallams* (1853), 10 N. Y. 509, 532: "The general rule in regard to the construction of the description of the premises in a deed is one of the utmost liberality. The intent of the parties, if it can by any possibility be gathered from the language employed, will be effectuated." To the same effect, see *Hannon* v. *Hilliard* (1885), 101 Ind. 310; *Roehl* v. *Haumesser* (1888), 114 Ind. 311. It is not the office of a description to identify the land, but to furnish the means of identification. *Rucker* v. *Steelman* (1881), 73 Ind. 396; *Scheible* v. *Slagle* (1883), 89 Ind. 323; *Hannon* v. *Hilliard, supra;* *Trentman* v. *Neff* (1890), 124 Ind. 503; *Collins* v. *Dresslar* (1892), 133 Ind. 290; *Edens* v. *Miller* (1897), 147 Ind. 208; *Elsea* v. *Adkins* (1905), 164 Ind. 580.

It is thoroughly settled that extraneous and 12. parol evidence is competent to apply the terms of a deed to the subject-matter. *Colerick* v. *Hooper* (1852), 3 Ind. 316, 56 Am. Dec. 505; *Torr* v. *Torr* (1863), 20 Ind. 118; *Guy* v. *Barnes* (1867), 29 Ind. 103; *Baldwin* v. *Kerlin* (1874), 46 Ind. 426; *Indiana Cent. Canal Co.* v. *State* (1876), 53 Ind. 575; *Roehl* v. *Haumesser, supra;* *Tewksbury* v. *Howard* (1894), 138 Ind. 103; *Elsea* v. *Adkins, supra.* And see *Wills* v. *Ross* (1881), 77 Ind. 1, 40 Am. Rep. 279; *Clark* v. *Crawfordsville Coffin Co.* (1890), 125 Ind. 277.

Perhaps there might be no serious difficulty, under the rules of law, in reaching the conclusion that the descrip-

tion of the house was sufficient, on the principle that that is certain which can be rendered certain. But as to the property referred to as "the lots," if it be considered that that property does not appear by the letter of August 1 to be part and parcel of the property on which the house is situate, it is possible that without the preceding correspondence, and in the absence of proof that the writer did not own any other lots, the description is so far left without any external standard to be referred to that it would have to be held that the contract could not be enforced because of the statute of frauds. *Doherty* v. *Hill* (1887), 144 Mass. 465, 11 N. E. 581. We are of opinion, however, that the whole correspondence may be looked to in determining the subject-matter of the negotiation. While there is no doubt that a distinction is to be observed between an agreement and a note or memorandum thereof, as those terms are used in the statute of frauds, yet such has been the holding of the courts concerning the removal of ambiguities in written instruments and the evidencing by writing of oral agreements as to warrant the assertion of Lord Ellenborough, in *Shippey* v. *Derrison* (1805), 5 Esp. 190, that "the statute was only intended to protect persons from having oral agreements imposed upon them." It was said in *Barry* v. *Coombe* (1828), 1 Pet. *640, 7 L. Ed. 295: "An examination of the cases on this subject, will show that the courts of equity are not particular with regard to the direct and immediate purpose for which the written evidence of a contract was created. It is written evidence which the statute requires." While, of necessity, a contract which is oral can only be evidenced by a note or memorandum subsequently made, yet where the agreement is in writing, there is no objection to the use of prior writings concerning the subject-matter, which are referred to in the agreement, for the purpose of clearing up that which is uncertain therein. *Ryan* v. *United States* (1890), 136 U. S. 68, 10 Sup. Ct. 913, 34 L. Ed. 447; *Wills* v. *Ross,*

*supra; Baumann* v. *James* (1868), L R. 3 Ch. 508.  In the case last cited it was held that an offer of the defendant to make a lease for fourteen years "at the rent and terms agreed upon," which offer had been accepted, might be explained and taken out of the statute by a negotiation in writing, had some six months before, between the plaintiff's and the defendant's solicitors, it appearing that the parties had afterwards taken up the negotiation without the intervention of said solicitors.

The requisite written evidence of the contract may be established through the medium of letters, as well as by more formal writings, it only being necessary that 14. they should so refer to each other as to amount to written evidence of the transaction. *Ryan* v. *United States, supra; Baumann* v. *James, supra; Ridgway* v. *Wharton* (1857), 6 H. L. C. *238; *Kennedy* v. *Lee* (1817), 3 Mer. 440, 451; Wood, Frauds, pp. 648, 653; *Roehl* v. *Haumesser, supra; Austin* v. *Davis* (1891), 128 Ind. 472, 12 L. R. A. 120, 25 Am. St. 456.  It was said in the last case cited:  "If a contract which comes within the statute of frauds can be extracted from correspondence between the parties on the subject of the contract, the statute is satisfied."

Where the reference is very general, and therefore indefinite, parol evidence may be introduced to show what instrument was referred to.   *Ridgway* v. *Wharton,* 15. *supra; Baumann* v. *James, supra; Cave* v. *Hastings* (1881), 7 Q. B. D. 125; *Long* v. *Millar* (1879), 4 C. P. D. 450; *Shardlow* v. *Cotterell* (1881), 18 Ch. D. 280; *Shardlow* v. *Cotterell* (1881), 20 Ch. D. 90; *Coupland* v. *Arrowsmith* (1868), 18 Law T. 755; *Wills* v. *Ross, supra;* Wood, Frauds, §364; 2 Phillips, Evidence (3d ed.), 298.  According to *Baumann* v. *James, supra,* it is 16. sufficient, although the writing does not contain an express reference, if it can be said in the light of the facts that the prior writing, and nothing else, could have

been referred to. Even where there is no direct reference to a prior writing and the connection is not shown by parol evidence, the character of the writings may still be such as to show, upon their face when placed in juxtaposition, that they are connected (*Beckwith* v. *Talbot* [1877], 95 U. S. 289, 24 L. Ed. 496; *Grafton* v. *Cummings* [1878], 99 U. S. 100, 25 L. Ed. 366), and we are of opinion that we are within the cases in holding that a reference in general terms to an agreement or understanding may in some circumstances be inferred to have had reference to the only written agreement or understanding which is produced on either side upon the trial. *Western* v. *Russell* (1814), 3 Ves. & B. 187; *Johnson* v. *Dodgson* (1837), 2 M. & W. 653, *per* Lord Abinger; Wood, Frauds, §369.

The parol evidence in this case, and we refer especially to the testimony of Mrs. Boudinot in this connection, clearly removed all uncertainty as to whether the proposition related to the same property throughout.

But the internal evidence of this fact which the correspondence contained is noteworthy. The parties thoroughly understood each other upon the conclusion of the preliminary correspondence. Mrs. Langford had proposed to convey "the three lots in this half block that your uncle traded for," and she particularized in describing it as "this nice house" and "the rest of this piece of property." This reference appellant evidently understood, for she refers to what had been offered as "the old home property that you have improved and the nice new house." Although appellant's first letter can not be regarded as an acceptance in law, yet it is clear from the letters of June 23, and July 4 that after the death of appellant's mother Mrs. Langford assumed that the conditional agreement had become absolute. This brings us to the letter of August 1. It will be noticed that in this letter the writer introduces the offer by the words, "you know it is to be yours," while immediately after the making of the proposition she cautions

appellant not to say anything "of our understanding in this at present." If we were to assume that between March 30 (the date of appellant's conditional acceptance) and August 1 there had been a different understanding reached, we should be compelled to indulge the supposition that the parties had opened up a negotiation concerning a matter that they were already at an understanding about, an understanding that was evidently satisfactory to both, and that Mrs. Langford had within a brief time learned to apply the familiar terminology, "the lots," in an entirely new way, and all of this without any suggestion in the evidence that there was such a correspondence, or any hint as to what portion of the property, if any, the old description had come to be applied. Appellant is not only entitled to appeal to all of these circumstances, but to the self-disserving statements of Mrs. Langford as to the nature of the agreement between them. Assuming, as we think we must, that we have before us all the correspondence on the subject, we have only to say that to impute to Mrs. Langford an intent, in writing the letter of August 1, to make any different offer than that which had its basis in what she refers to in said letter as "our understanding," would be to assume that she used language to conceal thought.

Counsel for appellees press upon our attention the fact that in said letter Mrs. Langford used the words, "which is property worth at least $10,000." Could we have persuaded ourselves that the relative "which" referred to the whole property, we might have been able to hold that said letter contained a sufficient description under the statute of frauds, since it would suggest within itself the means of applying the description to the subject-matter, but it was this very doubt which required us to look to the prior correspondence to ascertain the intent. Of course, viewed as in the nature of a description, the words quoted, if inconsistent, would have to be rejected, as the least certain, under the rule *falsa demonstratio non*

*nocet,* if we look to the prior correspondence to ascertain what real estate was to be conveyed. The philosophy of the doctrine referred to is thus stated by Professor Wigmore: "Just as we found that the omitted terms were not essential to applying the description, so we may find that some of the inserted terms are not essential. Each description of a single object must be conceived of as a single utterance,—just as one cipher cable word may represent a message of forty words. We are doing it no violence by ignoring the nonessential terms; for neither the omission nor the insertion of nonessential terms alters its existence as a whole. By conceiving clearly the singleness of each description as a symbol of a single object, we appreciate that the imperfections of either omission or insertion do not destroy its character as a single effort at the designation of a single object. And so we come to the maxim, *falsa demonstratio non nocet.*" 4 Wigmore, Evidence, §2476. The effect of the rule referred to, if we view the letter in question in the light of the correspondence preceding it, is well illustrated by *Parker* v. *Kane* (1859), 22 How. 1, 16 L. Ed. 286, where, as will be seen, the court very closely confined the extrinsic evidence. It was there said: "The description of the property conveyed as lots numbers one and six of the fractional quarter is a complete identification of the land, having reference to the official surveys of the United States, and according to which their sales are made. The more general and less definite description can not control this; but whatever is inconsistent with it will be rejected, unless there is something in the deed, or the local situation of the property, or of the possession enjoyed, to modify the application of this rule." See *Thayer* v. *Finton* (1888), 108 N. Y. 394, 15 N. E. 615.

The words concerning value which are found in the letter of August 1 do not, however, create the difficulty which counsel for appellees suppose. Indeed, we think 19. that the difficulty practically disappears when we assume that the word "which" referred to its last

antecedent, "the lots," considered apart from the corner house and the real estate immediately connected therewith. While the structure of the sentence makes this view permissible, the fact that Mrs. Langford at that time had in mind, as two separate ideas, the newly-painted house and the lots, increases the probability that it was "the lots," or remaining property, which she regarded as worth at least $10,000. Corroborative evidence of this is found in Mrs. Langford's first letter. It will be noticed that in that instance the writer, after describing the property as "the three lots in this half block that your uncle traded for," states that "it includes this nice house," and then, after interpolating two ideas, she speaks of "the rest of this piece of property." Again, it will be noticed that in said first letter mention is made of "this nice house," which the writer desires appellant "to take good care of," while it is after the reference to "the rest of this piece of property" that mention is made of "a rich provision for" appellant, so that she "will not need to teach." This same idea may have induced the writer to speak of the value of "the lots" separately in her last letter. Assuming, as we think we have shown we may do, that the statement of value did not refer to the house and an appropriate amount of frontage going therewith, but to the property to the north of that, no necessary inconsistency appears in the statement that the rest of the property is worth at least $10,000. As stated, the evidence of values which was received upon the trial related to the then present time. Mrs. Langford had reference, in using said words, to a time five years before, when, according to her letters, times were hard, rents were low, houses were long vacant, tenants destructive and liable to be dishonest, and when she was being called on to make an outlay of $3,000 for paving, which she thought would not add to the value of the property. Supposing that the paving was not at that time put down, or that the cost thereof was a charge against her frontage, discouraged with her invest-

ment, as she appears to have been, it is not strange that she
stated in effect that $10,000 was a minimum value for the
property to the north. It is to be recollected, however, that
in exploring for the intent of Mrs. Langford it is not her
subjective intent which is to be sought after, but rather the
fair meaning of her words, judged in the light of the cir-
cumstances; but of this subject we shall speak more at
length in another connection.

As to the objection that the letter of August 1 contains
a patent ambiguity, we deem it clear, notwithstanding the
aphorism of Lord Bacon, that as the law is settled
20. it is *always competent (except to the extent that
the statute of frauds may enter into the question)*
to apply words of general description to the subject-matter
by evidence of the situation and circumstances of the
parties. An ambiguity which vanishes, when viewed in
the light of such explanatory testimony as is admissible
under the rules of evidence, is not to be treated as vitiating
the instrument. 1 Greenleaf, Evidence, §§297-300;
Thayer, Preliminary Treatise on Evidence, 425; Elliott,
Evidence, §600; 2 Wharton, Evidence (3d ed.), §942;
2 Phillips, Evidence, ch. 7; Stephen, Digest of Evidence,
art. 91; 1 Jones, Real Prop. in Conveyancing, §339; *Pate
v. Bushong* (1903), 161 Ind. 533, 63 L. R. A. 593, 100
Am. St. 287; *Swett* v. *Shumway* (1869), 102 Mass. 365,
3 Am. Rep. 471; *Hollis* v. *Burgess* (1887), 37 Kan. 487,
494, 15 Pac. 536; *Burgon* v. *Cabanne* (1890), 42 Minn.
267, 44 N. W. 118; *Case* v. *Phoenix Bridge Co.* (1892),
134 N. Y. 78, 31 N. E. 254; and many of the cases hereto-
fore cited in the discussion of the sufficiency of the writing
under the statute of frauds. Speaking with reference to
Lord Bacon's distribution of ambiguities into patent and
latent, the Supreme Court of the United States, in *Barry
v. Coombe* (1828), 1 Pet. *640, 7 L. Ed. 295, said: "It
would, perhaps, be a more convenient, and, certainly, a
more intelligible distribution of the doctrine on this sub-

ject, if the cases were divided into positive, relative and mixed; the positive corresponding to the patent; and the relative to the latent ambiguities of the authors who treat of the subject. The mixed, would consist of those cases in which, although the ambiguity is suggested on the face of the instrument, the face of the instrument also suggests the medium by which the ambiguity may be removed." This is such a case. In addition to the descriptive words, the writing advises us that the offer is really a restatement of what the letter terms "our understanding." That in such a case it is competent to identify and give in evidence a prior correspondence, in which the understanding is reached and is explained, does not admit of question under the authorities above cited.

We have already discussed the competency of evidence to connect the correspondence and to apply the description to the subject-matter, but some further discussion 21. of the competency and effect of parol evidence seems necessary in order that we may determine whether there is any evidence in support of the claim of appellees that the subject of the proposal did not include the whole property. And we have first to suggest in this connection that the letter of August 1, contained, as we have seen, a proposal; that is, it was written with a purpose to affect rights through the medium of a contract, and therefore belongs to that class of writings known as dispositive, as distinguished from casual. 2 Wharton, Evidence (3d ed.), §§1083, 920, note. As to that class of documents the law is strict that parol evidence can not be received to contradict, vary, add to, or subtract from their terms. 2 Taylor, Evidence (Chamberlayne's ed.), §1132. It is said in 2 Phillips, Evidence (3d ed.), 357: "By the rule of common law, independently of the statute of frauds, parol evidence could not be received to contradict a written agreement; the written instrument must be considered as containing the true agreement between the parties, and as

furnishing better evidence than any which can be supplied by parol. The reason assigned by Lord Coke against admitting parol evidence to contradict the terms of a deed, is very general, and applies to the case of a written agreement, though writing may not have been absolutely necessary. 'It would be inconvenient,' he says, 'that matters in writing, made in consideration, and which finally import the certain truth of the *agreement* of the parties, should be controlled by an averment of the parties to be proved by the uncertain testimony of slippery memory.' " It was said in one case: "You can not vary the terms of a written instrument by parol evidence; that is a regular rule; but if you can construe an instrument by parol evidence, where that instrument is ambiguous, in such a manner as not to contradict it, you are at liberty to do so." *Goldshede* v. *Swan* (1847), 1 Exch. \*154.

It is to be remembered that in a case of this kind, where the writing is merely indefinite, the purpose of parol evidence should be exposition. As stated by Mr. Wharton: "The contract can not be varied; its obscure expressions may be explained, but this for the purpose, not of moulding, but of developing the true sense." 2 Wharton, Evidence (3d ed.), §946.

If we reason upon the assumption that the letter of August 1 was but a renewal of the proposition found in the letter of March 15—and if we take counsel of the evidence and of the nature of the correspondence, rather than of possible conjecture, that must be the conclusion—then we are at the end of the discussion, for the meaning is plain. The proposition is illustrated by the following observations of Mr. Justice Holmes: "I do not suppose that you could prove, for purposes of construction as distinguished from avoidance, an oral declaration or even an agreement that words in a dispositive instrument making sense as they stand should have a different meaning from the common one; for instance, that the parties to a contract orally agreed

that when they wrote 500 feet it should mean 100 inches, or that Bunker Hill Monument should signify Old South Church." 12 Harvard L. Rev. 417, 420. See, also, *Morris* v. *Thomas*, 57 Ind. 316; *Ketcham* v. *Brazil Block Coal Co.* (1883), 88 Ind. 515; *Gardner* v. *Caylor* (1900), 24 Ind. App. 521.

Appellant's case was based on the theory that the correspondence contained the written agreement between the parties, and the parol evidence introduced on her behalf was largely directed to the establishment of this fact. If she established this proposition, and the fact of performance, she was entitled to recover, and, unless the evidence of appellees tended to break down her claim, a case would be presented in which there was no conflict in the evidence. As circumstances which they claim tend to negative appellant's case, appellees' counsel call attention to the words in the letter of August 1, "which is property worth at least $10,000," to the testimony of the witness Smallwood, and to the will which was executed three days after said letter was written.

We have already shown that it is not plain that said statement of value was obviously incorrect, if it referred to the lots to the north, and therefore we are of opinion that said statement can not be treated as tending to show that the prior correspondence is not a memorandum of the agreement, because to do so would require that we should first infer that the statement related to all the property referred to in the letter of August 1, and, building upon that premise, that we should further infer that there must have been some intervening agreement, because the property mentioned in the letter of March 15 was worth more than $10,000. This is not a legitimate method of reasoning. Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be shown to exist, and not merely be presumed. No inference of fact or law is reliable if drawn from inferences which are un-

certain. *United States* v. *Ross* (1875), 92 U. S. 281, 23 L. Ed. 707; *Manning* v. *John Hancock Mut. Life Ins. Co.* (1879), 100 U. S. 693, 25 L. Ed. 761; *Young* v. *Montgomery* (1903), 161 Ind. 68; Starkie, Evidence, *80.

As to the claim of the witness Smallwood, the question first arises as to how any application could be made of it which would not contradict the letter of August 1. That letter described the property as "my house" and "the lots," and as the evidence only reveals the existence of one interior lot line upon the vacant space to the north of Mrs. Langford's home, it appears to us that his testimony tends rather to contradict than to bring out the meaning of the letter of August 1. The claim of said witness that he inferred that by the use of the term "the lot north" appellant referred to the forty-two feet north of the south sixty-six feet is evidently based on the fact that the will of August 3, 1897, devised appellant said sixty-six feet, but it can not be claimed that the north side of said last-named property was regarded by the parties as a lot line when the correspondence was had, and it must be remembered, as appellant stated to said Smallwood, that her claim was based on letters. But, as we have already shown, inferences can not be based on inferences, and as the words used by appellant, "the lot north," properly described the whole of the Holden property to the north of Mrs. Langford's home, since the property was unplatted, we think that there can not be built upon said witness's inference that appellant claimed less property the further inference that the proposition in the March 15 letter had in some way been modified before the letter of August 1 was written.

We come now to the consideration of the question as to whether said will can be considered as a side-light upon the meaning of said letter. It is one proposition to show the situation of the parties and the circumstances attendant upon the making of a contract, or even their negotiation, in case of ambiguity, and it is quite

another proposition to receive the subsequent, ex parte, self-serving declarations of one of the parties thereto. It has been well stated that: "The state of mind or intention of a person, being impalpable, can be ascertained only by means of outward expressions, such as words and acts. Accordingly, the law judges of the state of mind or intention of a person by outward expressions only, and excludes all questions concerning intentions unexpressed. It imputes to a person a state of mind or intention corresponding to the rational and honest meaning, not only of his words, but of his actions as well; and where the conduct of a person towards another, judged by a reasonable standard, manifests an intention to agree in regard to some matter, that agreement is established in law as a fact, whatever may be the real but unexpressed state of his mind on the matter." Clark, Contracts, 5; Leake, Contracts, 2. It was said by this court in Henry v. Henry (1858), 11 Ind. 236, 71 Am. Dec. 354, that a contract "may be interpreted by facts existing at the time it is used. But proving existing facts to aid interpretation is a different thing from proving mental intention of parties. The admission of such proof would open a wide door to perjury and fraud, while it is easy for parties, when making a contract in writing, to protect themselves from any wrong by making their contract explicit." See, also, 1 Greenleaf, Evidence, §277; 2 Phillips, Evidence (3d ed.), 282; Grant v. Grant (1870), L. R. 5 C. P. 727; 9 Cyc. Law and Proc., 578. In the leading case of Shore v. Wilson (1842), 5 Scott N. R. 958, 1038, which involved the meaning of certain old deeds, Lord Chief Justice Tindal, after speaking of the manner in which difficulties concerning the meaning and application of words in a contract might be cleared up by parol evidence said: "But, whilst evidence is admissible in these instances for the purpose of making the written instrument speak for itself, which without such evidence would be either a dead letter, or would use a doubtful

tongue, or convey a false impression of the meaning of the party, I conceive the exception to be strictly limited to cases of the description above given, and to evidence of the nature above detailed; and that in no case whatever is it permitted to explain the language of a deed by evidence of the private views, the secret intentions, or the known principles, of the party to the instrument, whether religious, political, or otherwise, any more than by express parol declarations made by the party himself, which are universally excluded; for, the admitting of such evidence would let in all the uncertainty before adverted to; it would be evidence which in most instances could not be met or countervailed by any of an opposite tendency, and would in effect cause the secret undeclared intention of the party to control and predominate over the open intention expressed in the deed." Mr. Wharton says: "The mind changes rapidly; caprice, or a new though sudden light, may bring about an immediate and real change of my purposes. Or, supposing my mind remains unchanged, to permit my private intention to overrule the natural and obvious meaning of my written engagement would be to give to secret mental reservations an ascendency destructive of fair business dealing. And even supposing there be no such taint possible, to permit the treacherous medium of memory as to conversation to supersede the more exact and authoritative medium of a written statement, would be to subordinate the superior to the inferior mode of proof. For these and other reasons the courts have united, with limitations to be hereafter expressed, in holding that the obvious meaning of a dispositive document can not be varied by proof of the writer's intent." 2 Wharton, Evidence (3d ed.), §936. Bearing in mind the proposition laid down in an earlier portion of this opinion, that an offer in a letter is to be treated in law as being constantly held out until the time comes to close with it by an acceptance, it will be perceived that the testimony as to the writer's intervening act could not affect the

question. Besides, it would be most unjust to permit the will of August 3—a document of which appellant seems to have had no notice before going to Terre Haute, and which, after it came to her knowledge, she often besought Mrs. Langford to change—to be regarded as any evidence of the meaning of Mrs. Langford's letter of August 1. As applicable to such a case as this we may well quote the following from *Dillon* v. *Anderson* (1870), 43 N. Y. 231: "Minds can not meet when one keeps to itself what it means to do, nor can one party know that the other does not assent to a contract, the terms of which have been discussed and settled between them, unless dissent is made known. * * * That an act should be held to have or not to have effect, and one party to it, to be bound or not as the other party to it should, by his undisclosed purpose, have determined, is warranted by no sound principle."

The will does not even purport to speak the maker's intention of three days before, but if it did, the declaration, as we have seen, would be inadmissible, for it is by words used in the making of the contract, viewed in the light of the circumstances, that the law, holding the party to resolute good faith, judges of his intent. The proposal in question was designed to operate *inter vivos,* and in the absence of a notice to appellant of its revocation before acceptance she was entitled to act upon the proposition extended to her on the assumption that Mrs. Langford's intent continued as before. It is not sufficient that proof of a fact lends a degree of probability as to the existence of the fact sought to be established. Rules of evidence must be general, and one of these rules, subject to exceptions as old and well recognized as the rule itself, is that heresay evidence is in its own nature inadmissible. *Queen* v. *Hepburn* (1812), 7 Cranch 290, 3 L. Ed. 348. In this instance the supposed evidence stands condemned as a self-serving declaration, and as within none of the exceptions to the rule excluding hearsay. We may also remark, in passing, that

we can not understand how, in the light of the evidence, the will could be considered, practically speaking, as other than in derogation of what was denominated in the letter of August 1 as "the lots."

Looking at the case broadly, we are unable to find any substantial basis of doubt as to the nature of Mrs. Langford's proposal. There was apparently one and the same proposition held out by her throughout the correspondence. The letters strongly tend to evince this fact, there is much parol evidence in support of it, and we find no evidence that can be applied in denial.

It is claimed on behalf of appellees that the contract is too uncertain to authorize a decree of specific performance. In this we think that counsel misapprehend the character of the uncertainties which constrain a court to refuse such relief. The only reason for a distinction in the matter of certainty between actions for damages and suits for specific performance is that in actions at law, in which the remedy is negative in character, a conclusion may often be reached without any exact consideration of the terms of the contract, while the nature of the equitable remedy demands that the court should be able to determine what the contract was which it is asked affirmatively to enforce. Fry, Spec. Perf. (3d Am. ed.), §361; *Burke* v. *Mead* (1902), 159 Ind. 252. We are confronted with no such difficulty here. As was said in *Colerick* v. *Hooper* (1852), 3 Ind. 316, 318: "Where a written instrument contains all the facts of a contract, except such as may legitimately be proved by parol evidence, where there is a written agreement, that instrument is sufficiently certain to be enforced."

Finally, appellees' counsel discuss, under what they term in their brief, "balancing the equities," the question as to whether, in view of the short duration of appellant's service, it may be regarded as fair to award her the property in controversy. Mere inadequacy

of consideration is not, in and of itself, a sufficient reason for refusing specific performance. *Hamilton* v. *Hamilton* (1904), 162 Ind. 430. But we may remark, in passing, that the extent of the consideration, there having been performance, should be measured by the breadth of appellant's undertaking, rather than the fact that the actual service was only for about three and one-half years. There are no circumstances of overreaching or even of hardship in the case. It was decedent's own proposal. She could not take her property with her, and she procured by her agreement a loving service that she stood greatly in need of.

In conclusion, we have to say that the case appears to us to be one in which we should, in addition to reversing the judgment, direct the entry of a decree as prayed. It is so ordered.