GEORGE BLESS, *Appellee*, v. MARY BLIZZARD, *Individually and as Administratrix, etc., Appellant.*

No. 17,342.

SYLLABUS BY THE COURT.

1. CONTRACT—*To Make a Will—Consideration.* The words "to stay with and care for," used to express the consideration of a contract to make a will, have no fixed legal signification. In the light of the situation and circumstances of the contracting parties in this case they may well indicate personal association, care and attention, not including the furnishing of groceries, other necessaries and medical attention; and the parties themselves having so interpreted the contract that will be accepted as the true meaning.

2. ———— *Specific Performance.* Under the facts of this case a contract of the kind indicated, whereby the will if made would devise land worth $2300 subject to debts to the amount of $600, is not inequitable and will be specifically enforced although the promisor lived and enjoyed the consideration for only eighteen months.

Appeal from Sumner district court. Opinion filed January 6, 1912. Affirmed.

*Albert Faulconer,* and *W. L. Cunningham,* for the appellant.

*Ed. T. Hackney, W. P. Hackney,* and *J. T. Lafferty,* for the appellee.

The opinion of the court was delivered by

BURCH, J.: John Noel was divorced from his wife, Catherine Noel, on October 6, 1906. The farm of 160 acres on which they lived was divided between them, the woman receiving the east 80 acres on which the buildings were situated. When the divorce was granted Noel and George Bless, a nephew of Catherine Noel, who had been raised as a member of the family, went to board with one Steele. Soon afterward Noel built a small house on the west 80 acres and he and Bless went there to live. A lease was drawn up whereby Noel leased the land and his horses and farming implements to Bless for the term of one year beginning the first of the previous August. In return Bless was to pay one-fourth of the grain raised on the premises and to board and care for Noel and treat him like a father. If the lease ever were what on its face it appeared to be its terms were disregarded, and the next spring Noel leased thirty acres of the land to T. O. Roberts for corn. Noel and Bless continued to live together on the land until March 14, 1908, when Noel, being in the last stages of a fatal disease, went over to the home of his former wife, where he died on April 30. Soon after the divorce was granted, Noel made a will giving his

land to Bless in return for Bless taking care of him the rest of his life. Shortly before Noel's death his daughter, Mary Blizzard, obtained possession of the will and destroyed it under circumstances indicating that her conduct lacked her father's voluntary and unconstrained approval. She was appointed administratrix of her father's estate, and in due time Bless brought an action against her to compel the specific performance of a contract by Noel to leave his land to the plaintiff in consideration of the plaintiff staying with him and caring for him as long as he should live. The plaintiff recovered and the defendant appeals.

It is said that the making of the contract alleged and its terms were not sufficiently established. It is not necessary to review the evidence. A definite contract to leave the land to Bless by will was clearly and certainly established within the rule stated in *Anderson v. Anderson,* 75 Kan. 117, 88 Pac. 743. Much of the evidence consisted of statements of Noel to his neighbors and friends concerning the arrangement. Some cases are cited to the effect that mere admissions and declarations are not enough. They need not be discussed. Noel's statements were corroborated by his will and by many circumstances.

It is said that the contract was not performed by the plaintiff. Bless was not responsible for Noel's leaving. Indeed Noel himself was probably not responsible for doing so, and the evidence is conclusive that the contract was performed with assiduity unless it be for the fact that Noel paid all the bills for groceries and other necessaries and for medical attention.

The contract, as alleged and proved, was "to stay with and care for" Noel. These terms have no fixed legal signification and the contract must be interpreted according to the usual canons. Bless was to stay with Noel and not Noel with Bless. Therefore Noel was to provide the place and the idea of maintenance and support by Bless in the broad meaning of those terms is so

far excluded.    In some instances to "care for" may
signify nurture in the fullest sense, as when referring
to a child.   Applied to the situation and circumstances
of Noel and Bless, however, the expression may well
denote that personal care and attention of which Noel
was particularly in need, as will appear hereafter.   The
evidence is clear that this is the meaning which was
attached to the contract by both the parties, and the
court, and others, can not go far wrong by accepting
their interpretation.

It is said that the contract is without adequate con-
sideration and is inequitable because of the shortness
of the time during which Bless stayed with Noel and
took care of him.   The value of the land appears to be
about $2300.   The decedent left debts to the amount of
about $600, so that there remains to Bless a net benefit
of about $1700.

The evidence shows that Noel was seventy years old
and was afflicted with physical maladies which made
close association with him repellent, and at the same
time placed him in need of personal care and attention.
His home was broken up.   His wife and daughter were
turned against him.   He might live a long time, but he
was not a sufferable addition to the family of any
friend, and to others he was impossible.   Bless was a
young man of twenty-three years, apparently of the
normal type, including the disposition to be loyal to
one who had stood in the place of a father toward him.
He was the one person to whom Noel could turn for
care and attention touched and sweetened by that per-
sonal regard which fortifies considerate and patient
endurance of unpleasant and even nauseating tasks,
and which money can not buy.   So Noel said to Bless,
"Stay with me and care for me until I die and I'll will
you my land."   Bless consented, and thereby, for a
time as uncertain as the duration of Noel's life, cut
himself off from the pleasures, the prospects and the
opportunities of a young man of his station and took

upon himself the burden of Noel's care through trying days and more trying nights—a renunciation and a task not easy of estimation according to exact pecuniary standards.    The case therefore is one in which the consideration for the contract lies in the breadth and scope of the undertaking, rather than in the fact of service for a particular time.    (*Warner v. Marshall,* 166 Ind. 88, 122, 75 N. E. 582.)    The case of *Berg v. Moreau,* 199 Mo. 416, 97 S. W. 901, is quite like this one.    An old man, the members of whose family were dead except one son from whom he was estranged, agreed to will property worth $1000 or more to a man and his wife if they would live with and care for him until his death.    Although somewhat feeble he was quite active and did not anticipate immediate death, but he lived only a year.    Eleven days before he died he made the will agreed upon, but eight days later, at the instance of friends of his son, revoked it and made another. The agreement was specifically enforced because the contract was not unconscionable and was fully performed on one side; it was not procured by fraud or other improper means, but was freely entered into by competent persons; it did not contemplate the mere hire of service, but it included ministration to the needs and comforts of an old man, which is of more value than money and can not be compared with the jingle of coin; and the fact that through early death the burden assumed proved to be less onerous than contemplated afforded no cause in equity for the court to refuse to recognize the contract and to drive a keener bargain on the basis of wages.    The same is true here.

There are many similar decisions in the books, but it is claimed that this court has taken a contrary view in the case of *Hazleton v. Reed,* 46 Kan. 73, 26 Pac. 450, where it was said:

"In this case, the services of Hazleton with Ricket were so brief—being only for about 18 months—that

the value of the same could easily be computed." (p. 78.)

The decision is not one of controlling authority. The contract involved expressed a business arrangement between Ricket and Hazleton. It also provided that Hazleton should live with Ricket and take care of Reed in health and sickness. In the case of *Reed, Ex'r, v. Hazleton,* 37 Kan. 321, 15 Pac. 177, it was held that the instrument was not a deed but was testamentary in character, did not entitle Hazleton to maintain ejectment for the land in controversy, and that Hazleton's recourse for any services performed under the contract was by presenting a claim against Ricket's estate to the probate court or by an action for their value. In *Hazleton v. Reed,* 46 Kan. 73, 26 Pac. 450, the object was to establish, by means of this testamentary document, a contract either to deed or to will the land. The former holding was adhered to, which, as the court said, disposed of the case. The syllabus reads as follows:

"It may be laid down as a general rule, that a written instrument which discloses the intention of the maker respecting the posthumous destination of his property, and which is not to operate until after his death, is testamentary in its character, and not a deed or contract, and may be revoked." (p. 73, syl.)

The result was that Hazleton had no claim on the land, and of course his only means of obtaining anything for whatever services he had performed, which were not described at all, was by proving their value in some proper proceeding. In discussing this really extraneous subject the court noted the difficulty in awarding adequate relief in cases where the law furnishes no standard by which to estimate value and can only make an approximation in that direction by decreeing specific performance, but it was not regarded as formidable because Hazleton's services continued for only eighteen months.

Certain evidence which was objected to was properly

admitted, and in any event the trial being before the court prejudice will not be presumed. Criticisms of the judgment of the district court on other grounds are not well founded, and it is affirmed.