NELS ANDERSON *et al* v. HILDA ANDERSON.

No. 14,842  (88 Pac. 743.)

SYLLABUS BY THE COURT.

1. CONTRACTS—*Specific Performance.* Whether equity will de-
cree the specific performance of a contract rests in judicial
discretion and always depends upon the facts of the par-
ticular case. As a rule, when a definite contract to leave
property by will has been clearly and certainly established,
and there has been performance on the part of the promisee,
equity will grant relief, provided the case is free from objec-
tion on account of inadequacy of consideration and there are
no circumstances or conditions which render the claim in-
equitable.

2. ——— *Agreement to Will Property to Adopted Child.* In an
action for specific performance, where the trial court finds
upon sufficient evidence that a written contract was made for
the benefit of plaintiff between her parents and childless rela-
tives, husband and wife, by the terms of which plaintiff while
a child of eight years was to be received into their family and
treated as their own child, reared, nurtured and cared for as
though naturally born to them, they to receive her services
and obedience during her minority, and agreeing that she
should receive at their death all the property they died pos-
sessed of; that plaintiff had fully performed her part of the
contract; that the husband died leaving all his property by
will to the wife, who afterward died intestate; a decree for
specific performance against the heirs at law of the wife,
and holding that plaintiff is the legal owner and entitled to
the possession of all the property of which the wife was pos-
sessed at her death, will be upheld.

Error from Shawnee district court; ALSTON W.
DANA, judge. Opinion filed January 5, 1907. Affirmed.

STATEMENT.

HILDA ANDERSON brought suit for the specific per-
formance of an alleged written contract between Nels
Palmlund and Cecelia Palmlund, his wife, both de-
ceased, and plaintiff's parents, Pehr Anderson and
Nella Anderson, by the terms of which the Palmlunds
were to receive her into their home in all respects as

their own child, and she was to be left all the property of which they died possessed.

Upon issues joined the cause was tried to the court. A decree was rendered holding plaintiff entitled to specific performance, and to be the legal owner of all the property left by the Palmlunds. The defendants, Pehr Anderson, who is the father of plaintiff, and his brothers and a sister, who together constitute the heirs at law of Cecelia Palmlund, bring the cause here for review. The facts as found by the trial court, with conclusions of law, follow:

### "FINDINGS OF FACT.

"(1) Plaintiff was born in Sweden in the year 1865, and is a daughter of Pehr Anderson, one of the defendants herein, and his wife, Nella Anderson, and said Pehr Anderson and his codefendants, Nels Anderson, Magnus Anderson and Nellie Mathison, are full brothers and sisters of Cecelia Palmlund, and are her only heirs at law, except defendants Edna Freeland, Hattie Linden and Carrie Linden, whose rights have been heretofore determined in this action.

"(2) Said Cecelia Palmlund and her husband, Nels Palmlund, were born in Sweden and continued to reside there until the year 1868, when they moved to Topeka, Kan., where they resided until their deaths. The said Nels and Magnus Anderson and Nellie Mathison came to this country from Sweden about the same time and prior to 1870; Nels and Magnus Anderson settled in Osage county, and Nellie Mathison in Leavenworth, and she moved to Topeka in about the year 1881.

"(3) Plaintiff was born in Sweden about three years before said Nels and Cecelia Palmlund left Sweden, they acting as God-father and God-mother to said plaintiff when she was christened, when she was given Mrs. Palmlund's name 'Cecelia,' and were much attached to plaintiff from her early childhood. She was the second child, having one sister by the name of Ellen, and a brother by the name of August.

"(4) In the fall of 1872, and prior to the bringing of said plaintiff to this country, said Nels and Cecelia Palmlund made and entered into a written contract with Pehr Anderson and Nella Anderson, the parents

of plaintiff, whereby said parents agreed to part with plaintiff as their own child, and give her over to Nels and Cecelia Palmlund, promising and agreeing that if the parents of said plaintiff would send her from Sweden to Topeka, Kan., to live with them and become their child, they would receive her into their own home, as their own child, would treat her in all respects as if she had been naturally born to them, rear, nurture and care for her and have her custody and services as their own child, and at their death give her all the property they died possessed of.

"(5) The aforesaid contract and agreement, entered into between Pehr Anderson and Nella Anderson, the parents of plaintiff, of the one part, and said Nels Palmlund and Cecelia Palmlund of the other part, was in writing, and was evidenced by various letters and correspondence which passed between said Nels and Cecelia Palmlund and said Pehr and Nella Anderson, parents of plaintiff, prior to the time plaintiff was sent to Topeka, all of which letters were lost or destroyed long since.

"(6) Said plaintiff resided in Sweden with her parents until in the month of May, 1873, when she was by her parents delivered into the hands of one Martin J. Smith, a nephew of the Palmlunds, a native of Sweden, who was then returning from Sweden to this country, with instruction to him from plaintiff's parents to deliver said child to Nels Palmlund and Cecelia Palmlund, his wife, in Topeka, Kan. Said Martin J. Smith, while in Sweden, was provided with money by said Nels Palmlund and Cecelia Palmlund with which to pay for the transportation and expenses of the plaintiff to this country, and did bring plaintiff to Topeka, Kan., and deliver her, as instructed, to said Nels and Cecelia Palmlund, on May 25, 1873.

"(7) The name given said child, the plaintiff, by her natural parents, and by which she was christened and always known in Sweden, was Cecelia Anderson, and she always went by that name until she entered the home of Nels and Cecelia Palmlund in May, 1873, at which time her name was at once changed by Nels and Cecelia Palmlund to Hilda Palmlund, by which name she was always known and called in the home of the Palmlunds, in school and in this city and community until she was married in August, 1886, and the relation of parents and child continued in all respects be-

tween said Nels and Cecelia Palmlund and plaintiff at all times.

"(8) Plaintiff lived continuously and uninterruptedly and in the home of said Nels and Cecelia Palmlund from May 25, 1873, until her said marriage in August, 1886, and during all of said time she was an affectionate and obedient child, assisting in the general housework, milking the family cow, doing chores and discharging all the duties which an obedient child owes to its parents. The said Palmlunds held her out in the community and treated her in every respect as their own child, and plaintiff at all times addressed and treated them as her own parents. The plaintiff received in return the same care and affection which she would have been entitled to had the Palmlunds been her own parents, and she was taught to call Mr. Palmlund "father" and Mrs. Palmlund "mother," and did so call them.

"(9) When plaintiff was about 17 or 18 years old, at the suggestion of said Nels and Cecelia Palmlund, she learned and worked at dressmaking, and for a time while working at dressmaking (the evidence does not show how long) part of her earnings went for her clothes, and a part was given to Mrs. Palmlund, but plaintiff was not treated by the Palmlunds as a 'boarder,' or as one not a member of the family, and no account was kept of such earnings by them or by plaintiff.

"(10) After plaintiff was taken into the home of said Palmlunds her natural parents never in any manner exercised or attempted to exercise any care or control over her, nor had the custody of her at any time, nor in any manner contributed to her support or education. After plaintiff's natural parents came to Topeka to live plaintiff occasionally visited them, but never made her home with them, and she continued to reside with and make her home at the Palmlunds.

"(11) In the year 1886 plaintiff, when she was more than twenty-one years of age, was married, with the full consent of said Nels and Cecelia Palmlund, to her husband, Peter Anderson, with whom she now lives with her children. The evidence shows that the probate judge of Shawnee county wrote plaintiff's name in her marriage certificate as Cecelia Hilda Anderson.

"(12) Said contract and agreement, made and entered into between the parents of plaintiff and the said

Nels and Cecelia Palmlund, has been fully and completely performed by the plaintiff and her parents, Pehr Anderson and Nella Anderson.

"(13) Said Nels Palmlund died testate on the 8th day of August, 1901, leaving all of his property by his will, which was duly probated, to his wife, Cecelia Palmlund; and said Cecelia Palmlund died intestate on the 24th day of February, 1903, leaving the property described in the pleadings filed in this action.

"(14) That one child was born to said Nels and Cecelia Palmlund, which died in infancy, several years before plaintiff came to this country, and one of the considerations which moved them to enter into the contract hereinbefore stated was their childless state when plaintiff came to them, and their promise and intention, often expressed, was to legally adopt plaintiff and make her their heir.

"(15) At the time this action was commenced Mrs. J. C. Morrison was the duly appointed, qualified and acting administratrix of the estate of Cecelia Palmlund, deceased, since which time she has resigned and been finally discharged as administratrix, and by and with the consent of all parties to this suit H. G. Larimer was then duly appointed and has qualified, and is now the duly acting administrator of said estate, and has been substituted as a defendant herein as administrator of said estate in lieu of said Mrs. J. C. Morrison, formerly administratrix as aforesaid.

"(16) That after plaintiff's marriage she continued to live in the city of Topeka, and made frequent visits to the home of said Nels and Cecelia Palmlund, looking after their comfort and performing such offices of love and affection as a child naturally would toward its parents.

"(17) During the winter of 1870-1871 Nels Anderson, jr., a son of Nels Anderson, lived at the Palmlunds, and did chores for his board, and attended school. In 1885-1886 Anna Benton, a daughter of Magnus Anderson, also boarded at the Palmlunds and went to school, but there is no evidence to show the arrangement under which she lived there.

"(18) At the time plaintiff was brought to the home of the Palmlunds and prior thereto there was talk by plaintiff's natural parents and by the Palmlunds about the adoption of the plaintiff by the Palmlunds; but no adoption was ever had under the statutes of this state.

"(19) That subsequent to the arrival of plaintiff in this country Nellie Mathison paid the expenses of plaintiff's sister and brother to this country, and, in 1881, Nels Palmlund advanced expense money for plaintiff's father to come to this country.

"(20) Cecelia Palmlund died intestate on the 24th day of February, 1903, possessed of the property described in plaintiff's petition; but there was no evidence before the court showing when or how Cecelia Palmlund acquired the personal property belonging to her estate.

"(21) Nels Palmlund and Cecelia Palmlund took title by deed in fee simple to lots 86, 88 and 90 on Tyler street, in the city of Topeka, on March 26, 1887, and Nels Palmlund took title by deed in fee simple to lots 115 and 117 on Jackson street, in the city of Topeka, on the 25th day of January, 1892, which is the same real estate set out and described in the petition of plaintiff; that said Jackson street property, above described, was previously owned by the Palmlunds, they having purchased it about 1869, and built on the same and made it their home till about 1885, when they sold it, and purchased it back in 1892.

"(22) That Nels Palmlund, on the 7th day of August, 1901, by his deed duly executed, conveyed and transferred in fee simple to Cecelia Palmlund, his wife, all of the real estate described in the petition of plaintiff, to wit, lots 86, 88 and 90 on Tyler street, in the city of Topeka, and also lots 115 and 117 on Jackson street, in the city of Topeka.

"CONCLUSIONS OF LAW.

"(1) Plaintiff is entitled to the specific performance of the contract entered into between her parents, Pehr Anderson and Nella Anderson, and Cecelia Palmlund and Nels Palmlund.

"(2) Plaintiff is the legal owner and entitled to the immediate possession of all the property and estate of every kind left by Cecelia Palmlund and Nels Palmlund, and is entitled to hold the same free from any claim or right of said defendants or either of them."

*A. B. Jetmore,* and *Charles D. Welch,* for plaintiffs in error.

*D. H. Branaman,* and *Garver & Larimer,* for defendant in error.

The opinion of the court was delivered by

Porter, J.: Whether equity will decree the specific performance of a contract rests entirely in judicial discretion, and always upon the facts of the particular case. (*Hennessy v. Woolworth,* 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500.) Before relief will be granted it must appear that good conscience and natural justice require it.

There is no rule of public policy which forbids the making of an agreement to dispose of property in a particular manner by will. (*Edson v. Parsons,* 155 N. Y. 555, 50 N. E. 265; *Johnson v. Hubbell,* 10 N. J. Eq. 332, 66 Am. Dec. 773.)

When a definite contract to leave property by will has been clearly and certainly established, and there has been performance on the part of the promisee, equity will grant relief, provided the case is free from objection on account of inadequacy of consideration and there are no circumstances or conditions which render the claim inequitable. This is the general doctrine adhered to by the courts. (*Roehl, Administrator, v. Haumesser,* 114 Ind. 311, 15 N. E. 345; *Gall v. Gall,* 71 N. Y. Supr. Ct. 600, 19 N. Y. Supp. 332; 60 Cent. L. J. 265.)

The principle upon which courts of equity undertake to enforce agreements of this kind is well stated in *Bolman et al. v. Overall, Ex'r, et al.,* 80 Ala. 451, 2 South. 624, 60 Am. Rep. 107. It was there said:

"It is not claimed, of course, that any court has the power to compel a person to execute a last will and testament carrying out his agreement to bequeath a legacy, for this can be done only in the lifetime of the testator, and no breach of the agreement can be assumed so long as he lives. And after his death he is no longer capable of doing the thing agreed by him to be done. But the theory on which the courts proceed is to construe such an agreement, unless void under the statute of frauds or for other reason, to bind the property of the testator or intestate so far as to fasten a

*trust* on it in favor of the promisee, and to enforce such trust against the heirs and personal representatives of the deceased or others holding under them charged with notice of the trust.    It is in the nature of a covenant to stand seized to the use of the promisee, as if the promisor had agreed to retain a life-estate in the property, with remainder to the promisee in the event the promisor owns it at the time of his death, but with full power on the part of the promisor to make any *bona fide* disposition of it during his life to another, otherwise than by will." (Page 455.)

The case of *Sharkey v. McDermott*, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270, was this:  A man and wife entered into an agreement to adopt plaintiff as their child and leave her their property when they died, but failed to execute the agreement as to the adoption. Plaintiff wholly performed the agreement on her part by living with them and paying them all the attention due from a child to parents for many years.   The husband died leaving his property to the wife.   Plaintiff continued living with the wife as her child, and upon the death of the wife the court held that the contract was valid and that plaintiff was entitled to specific performance.   It was contended there, as it is here, that the statutory mode of adoption had not been complied with and that equity could not dispense with the requirement, and therefore that plaintiff could not recover, but the decision was placed squarely upon the ground that plaintiff's rights depended entirely upon the agreement and the action of the parties under the agreement.   The court said:

"This agreement was not merely and solely one to adopt the plaintiff, but was in part to leave the plaintiff the property at their death.   The fact that the parties, and each of them, may have failed and neglected to execute it, so far as the adoption was concerned, should not, we think, exonerate them from its further obligation to transfer their property." (Page 654.)

The case of *Winne v. Winne*, 166 N. Y. 263, 59 N. E. 832, 82 Am. St. Rep. 647, was exactly like the one here. The contract was in writing; it had been lost, and its

contents were proved by secondary evidence. The trial
court made a finding that a written contract had been
made by a childless person with plaintiff's mother for
his benefit, to the effect that the former would maintain
plaintiff, then an infant, as her own child, and at her
death give him all her property, if his mother would
surrender to her his custody and control. The court of
appeals, in affirming the judgment of the trial court,
reviewed the authorities quite fully and held that the
agreement was clear, definite and certain, based upon a
sufficient consideration, binding in equity, and enforce-
able against the estate of the promisor. The court
said:

"It has been suggested that such a contract might
be in conflict with the statute relating to wills and to
their manner of execution. This was not a contract
in the nature of a testamentary disposition of the de-
cedent's property. On the contrary, it was a contract
to be chiefly executed during the life of the decedent,
with compensation to be made at her death. It was a
method adopted to provide for the payment by her for
the custody, control and services of the plaintiff during
his minority. It may be observed in passing that the
decedent before her death received the full considera-
tion provided for by the agreement." (Page 268.)

Referring to some of the many considerations which
might influence a court of equity in this class of cases
the court further observed:

"If, however, the plaintiff, instead of following her
admonitions, and thus becoming an upright and re-
spected man, had become dissolute or otherwise led
an unworthy life, and thus entailed upon her sorrow
and disgrace, the court might well have refused this
relief." (Page 272.)

Another case very like the one at bar is *Sutton et al.
v. Hayden et al.*, 62 Mo. 101. The contract there was
found by the court to have been embraced in a letter
written to plaintiff by her aunt, promising that if plain-
tiff, her niece, would come and live with her she would
treat the niece as her own daughter and at her death
all she possessed should become the property of the

niece. The letter became lost and its contents were proved by the evidence of a witness who had seen it, as in this case. Specific performance of the contract was enforced against the heirs at law. (To the same effect see *Schutt v. Missionary Society,* 41 N. J. Eq. 115, 3 Atl. 398; *Healey v. Simpson,* 113 Mo. 340, 20 S. W. 881.)

The case of *Svanburg v. Fosseen,* 75 Minn. 350, 78 N. W. 4, 43 L. R. A. 427, 74 Am. St. Rep. 490, is another very similar one on the facts, except that the contract was not in writing. In this and in the following cases contracts like the one involved here, but which were in parol, were enforced upon the theory that performance by the child had taken the contract out of the statute of frauds, and for the reason that the services rendered were of such a character that their value could not be determined by pecuniary standards and the courts could say that it was not intended by the parties that the services should be so measured. (*Brinton v. Van Cott,* 8 Utah, 480, 33 Pac. 218; *Shahan, Ex'r, et al., v. Swan,* 48 Ohio St. 25, 26 N. E. 222, 29 Am. St. Rep. 517; *Wright v. Wright,* 99 Mich. 170, 58 N. W. 54, 23 L. R. A. 196; *Van Tine v. Van Tine* [N. J. Eq.], 15 Atl. 249, 1 L. R. A. 155; *Van Duyne v. Vreeland,* 12 N. J. Eq. 142; *Teske v. Dittberner,* 65 Neb. 167, 91 N. W. 181, 101 Am. St. Rep. 614, 70 Neb. 544, 98 N. W. 57; *Kofka v. Rosicky,* 41 Neb. 328, 59 N. W. 788, 25 L. R. A. 207, 43 Am. St. Rep. 685; *Brantingham v. Huff,* 43 N. Y. Supr. Ct., App. Div., 414, 60 N. Y. Supp. 157; *Gates v. Gates,* 34 N. Y. Supr. Ct., App. Div., 608, 54 N. Y. Supp. 454; *Parsell v. Stryker,* 41 N. Y. 480; Pom. Cont., 2d ed., § 114; and cases cited in 60 Cent. L. J. 265.)

The defendants rely upon the case of *Renz v. Drury,* 57 Kan. 84, 45 Pac. 71. That case is readily distinguished from this. Rights of inheritance were claimed, based upon a common-law adoption in Iowa. The court held that where the adoption of children is regulated by statute rights of inheritance can only be

acquired through adoption substantially in compliance with the statute. There was, it is true, a further claim of an agreement entered into by the foster-parents with the child when she was fifteen years of age, and of a compliance on her part, and the agreement was similar to the one in this case; but the court found that it rested in parol and was within the statute of frauds. In the present case, while there is some claim that the Palmlunds agreed to adopt plaintiff, the suit is not based upon that part of the agreement; but, like *Sharkey v. McDermott,* 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270, it is based upon the agreement to leave to plaintiff whatever property they possessed when they died. The opinion in *Renz v. Drury, supra,* which was by Mr. Chief Justice Martin, refers to *Sharkey v. McDermott,* and distinguishes that case for the reason that the contract there was in writing.

The main contention of the defendants is that the evidence is not sufficient to warrant the finding that the contract was made or to show its exact terms. With respect to the character of evidence necessary in cases of this kind to warrant a court in decreeing specific performance the rule is that the agreement should be clearly and definitely established. We are satisfied with the language of the court in *Edson v. Parsons,* 155 N. Y. 555, 50 N. E. 265, as follows:

"But, equally, would it be the duty of a court of equity to refuse that relief, where the agreement sought to be given effect was not certain and definite. Clearly, it should hesitate to assume the grave responsibility of implying an agreement, whose existence depends upon circumstances, inconclusive in their nature and permitting an inference either way. It is not essential to the intervention of equity, in order to prevent the accomplishment of fraud, that an agreement should be established by direct evidence. It may be established from such facts and circumstances as will raise an implication that it was made; and may have reinforcement from the evidence of the conduct of the parties, at the time and subsequently." (Page 567.)

The proof was sufficient to justify the court in making the findings of fact. While but one witness testified to the contents of the correspondence which made up the contract, the fact that a contract existed, and its terms as found by the court, are supported and reinforced by the conduct of all the parties.

The Palmlunds had no other child. The enforcement of the contract is not, therefore, opposed to public policy, as in those cases where it would result in the exclusion of the children or the wife or husband of the deceased. (*Gall v. Gall*, 71 N. Y. Supr. Ct. 600, 19 N. Y. Supp. 332.) The opposing claimants are all collateral heirs. These matters are always proper for the consideration of a court of equity. As suggested at the outset, the remedy rests in judicial discretion, and must depend upon the particular facts of the case. The claim that it is against public policy for the reason that it provides for the surrender of the care and custody of the child has no force. The contract had been performed upon the part of Hilda Anderson, and her parents as well. The state is no longer concerned. This is not a suit to compel the parents to abide by their part of the contract, nor is it a suit by the parents to secure the custody of a child, as in *Chapsky v. Wood*, 26 Kan. 650, 40 Am. Rep. 321.

We cannot agree with the contention of the defendants that the terms of the contract are incomplete and uncertain. Its terms provided that the Palmlunds were to receive Hilda Anderson at the age of eight years into their home; to care for, raise and educate her; to have her custody and control; and, in consideration of these benefits, and the opportunity thus afforded them to gratify their parental love and to receive her obedience, society and services in all respects as though she were their own child, they agreed that she should be given whatever property they possessed when they died. The parents, in consideration of the future benefits to their child, surrendered the

possession and control of plaintiff. She performed her part fully. The contract, then, so far as plaintiff is concerned, has passed from an executory to an executed one. All the authorities to which we have referred sustain the doctrine that a contract of this nature will be enforced when it is not inequitable. As was said by Chancellor Williamson in *Johnson v. Hubbell*, 10 N. J. Eq. 332, 66 Am. Dec. 773:

"It may be unwise for a man, in this way, to embarrass himself as to the final disposition of his property, but he is the disposer, by law, of his own fortune, and the sole and best judge as to the time and manner of disposing of it. A court of equity will decree the specific performance of such an agreement upon the recognized principles by which it is governed in the exercise of this branch of its jurisdiction." (Page 335.)

The rights of plaintiff depend in no respect upon any contract for adoption, nor upon any claim of inheritance through adoption, but wholly upon contract. We are content to rest our decision in this case upon the facts found by the trial court: that there was a definite contract entered into in writing, which removes the case wholly from the operation of the statute of frauds; that the contract was equitable and fair, based upon sufficient consideration, and fully performed by plaintiff; and for the reason that the particular facts and circumstances of the case are such, in our opinion, as to justify a court in its sound judicial discretion in granting the relief asked. Upon different circumstances and different proof a court might, on the other hand, deny specific performance of the same kind of a contract.

We do not regard *Renz v. Drury*, 57 Kan. 84, 45 Pac. 71, as laying down the hard and fast rule that a court of equity should never compel the specific performance of a parol contract of this character, but rather as an illustration of the doctrine, recognized almost

universally, that each case depends upon its own particular facts and circumstances, and the granting or denying of the remedy rests in judicial discretion.

The judgment is affirmed.