No. 18,929.

GRACE E. SMITH, *Appellee,* v. HUBER L. CAMERON et al.. (THE SOCIAL SERVICE LEAGUE OF LAWRENCE, KAN.,. *Appellant*).

### SYLLABUS BY THE COURT.

1. SPECIFIC PERFORMANCE—*Oral Agreement by Sister to Care for Brother—Agreement Fully Performed.* An oral agreement of a sister to remove from her parents' home and live with her brother as his housekeeper and to care for him, upon his promise that she shall have his property at his death, when faithfully kept by her, affords solid grounds for the exercise of the power of a court of equity by a decree for specific performance.

2. SAME. After living with her brother in his home for many years, performing the agreement referred to, the sister married, and for eleven years lived apart from her brother, until her husband died, when she returned to her brother's home and resumed her duties under the agreement, which she continued to perform for a long time and until his death. The brother in the meantime expressed satisfaction with her conduct and held her in affectionate regard. In these circumstances the conclusion of the district court that the agreement was in force at the time of the brother's death is upheld.

Appeal from Douglas district court; CHARLES A.. SMART, judge. Opinion filed June 6, 1914. Affirmed.

*M. A. Gorrill, Hugh Means,* and *R. F. Rice,* all of Lawrence, for the appellant.

*R. E. Melvin,* of Lawrence, for the appellee.

The opinion of the court was delivered by

BENSON, J.: This is an appeal from a judgment quieting the plaintiff's title to seventy-seven acres of land in Douglas county. The plaintiff's title is founded upon a parol agreement made with her brother, Hugh Cameron, in New York about fifty years before his death, which occurred in December, 1908. The Social Service League is a grantee holding under a conveyance made by a brother of the deceased. Other heirs are also defendants.

It is alleged in the petition that the plaintiff, then young and unmarried, left her parents' home in New York in April, 1858, to go with her brother, Hugh, also unmarried, to Kansas, pursuant to an agreement that if she would move to Kansas with her brother and live and make her home with him there she should be the sole beneficiary of all his property at his death; that she had fully complied with this agreement by being his housekeeper, and by nursing him in sickness, and devoting her life to his service; and that she had also worked upon and cared for the farm, the subject of this action, where they lived until his death, and where she still lives.

The defendants, except the Social Service League, did not appear, and judgment was rendered against them upon default. The league denied the agreement, and claiming title to one-fourth of the property asks for a reversal of the judgment upon the contention that the evidence was not sufficient to prove an agreement; and if any agreement was made it had been abrogated by the plaintiff's marriage.

Hugh Cameron was a Kansas pioneer. He settled upon a claim including the land now in controversy in or about the year 1854, and named it Camp Ben Harrison. He was a Kansas soldier in the war for the Union, and by successive promotions reached the rank of colonel and was made a brigadier-general by brevet,

thus gaining the title of general, as he is designated in the abstracts. He was never married. His sister, Grace, the plaintiff, lived with him in a rude cabin at Camp Ben Harrison before the war. The cabin was burned, but the time of its destruction is not shown. A hut was afterwards constructed, in which General Cameron lived for a time. He also lived in a cave, sleeping for a time upon a platform in a tree. Grace lived upon and cared for the place while her brother was serving as a soldier, and afterwards, although lodging for part of the time at the home of another brother. She was married in the year 1873, but lived with her brother for a year afterwards. After that she lived with her husband at different places for eleven years, but frequently returned to her brother's home, and he often visited her. When he was absent from home Mrs. Smith (Grace) and her husband looked after the place and cared for the stock. After Mr. Smith's death, in 1884, Mrs. Smith returned to live with General Cameron, and cared for him and for the home and farm until his death. He was absent at various times upon extended visits at inauguration services at Washington, and once on a visit to his old friend, Senator Ross, in New Mexico. She built a house in which she lived with him. This house still stands upon the place, where she still lives. At different times she loaned him sums of money, aggregating, as the evidence tends to show, about $3000.

The evidence offered to prove the alleged agreement consisted principally of the testimony of many persons who related conversations with General Cameron. Other testimony was given to prove plaintiff's services in the home and upon the place.

George Cameron, a brother of the General, testified that he "had two conversations with Hugh Cameron about contract between him and Mrs. Smith with reference to property in Kansas, one before the War of the Rebellion and one somewhere about 1884. General Cameron said that he had an agreement with Mrs.

Smith to come west with him, and when he got there, he would give her, for her kindness and services to him, all he had. . . . It was because I knew that he had made such an agreement with her and she had lived with him and taken care of him, that was the conditions and that was the reason, knowing the contract between them and performance on Mrs. Smith's part, that I made the deed to the property to her."

Mrs. Case, of Topeka, testified:

"Had many conversations with General Cameron, extending back for many years, sometimes at our home, at Judge Case's law office, various places, in which he said everything was Grace's anyway; it is all hers; that she had come to this country early in life to make a home for him and help look after his property interests and they had been very congenial and their relations always all right and that it was his agreement with her that if she survived him everything that they had should be hers; that he had promised her that. . . . I am sure my husband was present one time and Mrs. Smith and the General agreed on all these facts I have detailed here; he said Grace always took care of everything when he was away; he also said Grace furnished money to pay the taxes and keep up the repairs and to make improvements on the property; he said also that she furnished money to build a house on the place and did the work she wanted on it. . . . The General said the reason he was going to give this property to Mrs. Smith was she came to Kansas to make a home for him and she had faithfully done so all these years; he talked these things every time almost that he visited us and such statement was made within two years prior to his death. He told me that he was giving it to her as a recompense for what she had done for him, in a way, and she had made it possible for him to have his home; she had cared for him in his sickness and suffering. He said this arrangement had its inception before she came to Kansas. . . . That Grace took care of everything during war time; it was well taken care of."

Others testified as shown in the following quotations:

"Mrs. Smith has been in exclusive possession of place since General's death; she came to Kansas to keep house for him; her care of him was good care; he depended upon her for his home; I heard him discuss this matter I expect a half dozen times; last time I remember was about 1906; . . . He said Grace looked after things, in speaking about repairs and keeping up the improvements on the property. . . . He said 'Ours' in speaking of the property; from what he said I understood it had all been arranged when she came west that she was to have all the property; that is the way I understood it; . . .

"Q. That you gathered from what he said? A. Yes, sir, from all the conversations, that is what I gathered."

"The General, in conversations with me, intimated that everything belonged to Grace, intimated that in all our conversations; that everything was Grace's; I was out to the place several times; Mrs. Smith always looking after things, and especially when General was sick she had to go there and stay; . . . Mrs. Smith always looked after the property and cared for it when he was away; she had to look after everything; . . . she did things for him I wouldn't do if I was a slave, for anybody else; never heard him find fault with Mrs. Smith; he always spoke of her with the greatest regard."

"He said she had come out here to make a home for him and had been his housekeeper and kept his place; he said his sister, Mrs. Smith, took care of him when he was sick, always took care of him; that she always did the housework, did his washing, mending and such like work about the place; he said she was as good to him as anybody could be; that when he was away it took practically all her time. . . . He never said anything to me about making a will. Q. He never said anything to you about making a deed of that property to any person, did he? A. He said that when he died it was Mrs. Smith's."

"He told of wanting Grace to come to Kansas and that she came out here to be with him and take care of him, to be a companion to him."

Smith v. Cameron.

"He said he had made a special arrangement with Grace to come west, he was anxious for her to come and be out near him; he thought a great deal of her, and when he was through with it, she was to get it, the property, as compensation; that is all I can remember about what he said their arrangement was; there was no definite thing she was to do, only what she was doing all the time for him, every way that a sister could; it was Grace did this and Grace did that and he relied on her; she had loaned him money; she was there doing chores, I have seen her there; he acted as though he was perfectly satisfied."

"I have heard him make substantially this same statement four different times, that everything was Grace's; Grace had full charge of everything; whether he was there or not it was Grace always had charge of it. . . . He said Grace rebuilt the house that was burned on the property; he said she always took care of him when he was sick and done his washing and cooking for him and took care of him, done the work and took care of the stock."

There was ample evidence that the plaintiff cared faithfully for her brother in health and in sickness, and attended to the home, the farm and the stock for many years before her marriage and after her husband's death until the death of her brother. Her fidelity was observed by neighbors and was gratefully acknowledged by her brother.

In *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396, it was said:

"If . . . the contract is sufficiently certain and definite in subject matter and purpose and has been clearly and certainly established by the evidence, and the facts are such as to take it out of the operation of the statute of frauds, and there are no circumstances or conditions which would make enforcement inequitable, courts do not hesitate to give effect to a contract, although it is not in writing. An oral agreement that operates as a transfer of land must, of course, be made out by clear and satisfactory proof, but it is not essential that it be established by direct evidence. If the

42—92 KAN.

facts and circumstances brought out are such as to raise a convincing implication that the contract was made and to satisfy the court of its terms, and that there would be no inequity in its enforcement, it is enough." (p. 700.)

That opinion cites and follows *Anderson v. Anderson,* 75 Kan. 117, 88 Pac. 743, 9 L. R. A., n. s., 229, where this subject is so fully discussed that nothing further need be said here concerning the general principles involved. Later cases have confirmed these principles in the jurisprudence of this state. (*Taylor v. Taylor,* 79 Kan. 161, 99 Pac. 814; *Heery v. Reed,* 80 Kan. 380, 102 Pac. 846; *Bless v. Blizzard,* 86 Kan. 230, 120 Pac. 351; *Schoonover v. Schoonover,* 86 Kan. 487, 121 Pac. 485; *Dillon v. Gray,* 87 Kan. 129, 123 Pac. 878; *Holland v. Holland,* 89 Kan. 730, 132 Pac. 989; *Hawkins v. Hansen,* ante, p. 73, 139 Pac. 1022.)

It is contended that the terms of the alleged contract were not sufficiently definite. They were very simple. The sister was to have the brother's property at his death in consideration of her removal to Kansas, and living with and caring for him. This, if proven, and followed by performance on her part, is sufficient in the light of the cases already cited.

The statute of frauds can not be a bar to the performance if the agreement is sufficiently definite and is proved by clear and satisfactory evidence. It is not necessary that the evidence should be direct. (*Bichel v. Oliver,* supra.) It must be presumed from the decision that the district court found the evidence clear and satisfactory; and as there was competent and substantial testimony to support the finding it can not be disturbed here. (*Wooddell v. Allbrecht,* 80 Kan. 736, 104 Pac. 559.) One of the parties to the alleged agreement having died, and no written memorial being found, testimony of his declarations and admission, together with the conduct of the other party, and her testimony so far as admissible under the statute, afforded the only available means of proof.

The agreement being established, the next inquiry is whether it was abrogated by the marriage of the plaintiff, and her consequent absence and cessation, or partial cessation, of services while living with her husband. It can not be held as a proposition of law that the mere fact of marriage annulled the contract. The circumstances must be considered and the intention of the parties must be determined. She remained with her brother for a year after her marriage, continuing her services in his home. They continued in affectionate regard for each other. He made no complaint of her absence, but spoke of her in the kindest terms, evincing not only a grateful appreciation of her past services but his intention that she should still have the property. If he had objected to the marriage or insisted on her continued presence and regular services an annulment might have been presumed, but such a situation is not presented here. Certainly the parties to the agreement had as perfect a right to modify it, as to make it in the first instance. If after her faithful service for many years the brother was willing that she should marry and still retain the benefit of the agreement, no principle of equity will thwart the purpose. He may have believed that his own happiness, as well as hers, would be promoted by her marriage. A sister's welfare may well be the highest consideration for a brother's relinquishment of her services, especially when those services have been rendered through sacrifices made in youth and continued through years of hardship.

If, however, it should be held that the agreement was abrogated by the marriage, no good reason is perceived why it may not have been renewed after the husband died and the sister returned to her former service. It will be observed that General Cameron's declarations concerning the sister's interest in the property and his intention that she should have it were continued practically to the time of his death. It is concluded that there was competent evidence to sus-

tain a finding that the agreement was not only made as alleged, but that it was treated by both parties as in full force down to the time of General Cameron's death.

An oral agreement of this nature, established by satisfactory proof and kept in good faith, affords solid ground for the exercise of the powers of a court of equity by a decree for specific performance. The brother, with views and habits of life different perhaps from the majority of men, availed himself through many years of the service of a sister, who remained loyal to her agreement through all the vicissitudes of that service, the nature of which can be readily appreciated when we remember the hardships of pioneer life and the nature of the duties she performed. In such a situation the law provides no standard whereby to measure the value of the services, and it remains for equity, applying the principles of natural justice and good conscience, to carry into effect the agreement of the parties. Happily in this instance neither party ever desired to be released from it. The one living claims the benefit of the agreement to which the other, according to his latest expressions, had gladly assented. It is true that in many of the conversations related by witnesses, and in one letter, a purpose to bestow this property on the sister by will or conveyance was declared. If the case rested upon such declarations alone the plaintiff would fail, but an agreement was also admitted and repeatedly asserted. An intention to devise or convey the property was not inconsistent with an original agreement.

The judgment is affirmed.