No. 44,853

ALBERT H. ROBERTS, *Appellant*, v. HARLEY A. COFFEY, Administrator dbn, cta, of the Estate of Charles T. Roberts, Deceased; HELEN ROBERTS MAY, MARLENE ROBERTS, Natural Guardian of Kim Leslie Roberts, and KIM LESLIE ROBERTS, A Minor, *Appellees*.

(426 P. 2d 30)

Opinion filed April 8, 1967.

*Frank G. Theis*, of Arkansas City, argued the cause and was on the briefs for appellant.

*Earle N. Wright*, of Arkansas City, argued the cause, and *Ted M. Templar* and *Tom Pringle*, of Arkansas City, *Grant H. Cole*, of Winfield, and *Ralph W. Gilbert*, of Angleton, Texas, were with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: The action was one to enforce performance of an oral contract to devise and bequeath the plaintiff all of the property of his parents existing at their death. The plaintiff has appealed from that part of the judgment denying specific performance of the contract upon the ground performance would be inequitable.

As preliminary, it should be noted the decedent executed his last will and testament on August 5, 1952, and named the plaintiff as executor. Following the decedent's death, December 6, 1960, the plaintiff petitioned for admission of the decedent's will to probate and he was appointed executor. After serving in that capacity some ten months as hereafter noted, he petitioned to be discharged as executor, filed an accounting, and was discharged on November 28,

1961. Shortly thereafter the plaintiff appealed from the order of the probate court admitting the decedent's will to probate upon the ground he lacked mental capacity when he executed his will, which contention was denied by the district court, and that judgment was affirmed by this court in *In re Estate of Roberts,* 192 Kan. 91, 386 P. 2d 301.

Shortly before the running of the nonclaim statute (K. S. A. 59-2239), the plaintiff filed his petition for allowance of demand against the decedent's estate based upon the oral contract that he would receive all of his parents' property existing at their death. Upon the order of the probate court, the case was transferred to the district court for trial pursuant to K. S. A. 59-2402a and b.

Issues were formed by appropriate pleadings and the case was tried by the district court which made findings of fact and conclusions of law. All of the parties to the litigation accept those findings of fact, and the plaintiff has incorporated them in his brief as his statement of facts pertinent to the points relied upon as required by Rule No. 8 (*b*) 2. (194 Kan. xvii.) In reality, the case comes to this court as if presented upon the parties' stipulation of facts, and since the detailed findings of fact of the district court and its conclusions of law set forth the decisive facts, outlines the issues and the grounds for the judgment rendered, this court adopts the findings of fact and incorporates the same as the basis upon which to consider and decide the case. The findings of fact and conclusions of law read:

"FINDINGS OF FACT

"1. The plaintiff, Albert H. Roberts, was born July 2, 1897, the only child of Charles T. Roberts and Stella Roberts. His father was a farmer and when plaintiff was the age of six years, the family moved to Winfield at which place, the father entered the employment of selling monuments.

"2. After finishing his schooling, plaintiff engaged in various employments mostly of a travelling salesman nature at places away from Winfield. In 1919 the father acquired the monument business and for an interval of about a year, plaintiff was in the monument business with his father, under the name of Charles T. Roberts and Son until 1920, when because of tuberculosis, he was confined in a sanitarium in Colorado for a year. On his release from the hospital, he worked for another monument company elsewhere and returned again to Winfield, at the request of his parents, and worked with his father in the monument business for a short period of time, less than a year. That thereafter plaintiff again left Winfield and secured employment with several wholesale grocery concerns, most of them being in the State of Oklahoma, until he returned again to Winfield, at the request of his parents, early in 1927; where he again was associated with his father in the monument business. After work-

ing with his father less than a year at this time and because of depressed economic conditions about that time and the fact that monument collections were poor, plaintiff had the opportunity and desired to obtain better employment again as a traveling salesman for a wholesale grocery concern away from Winfield.

"3. At that time, plaintiff's parents told him that he had never farmed, that there was a tract of land east of a farm tract they owned [SE ¼, Sec. 21, T. 31, R. 5 E, Cowley County], and they would buy the east tract [SW ¼, Sec. 22, T. 31, R. 5 E, Cowley County] if plaintiff would go out there and take care of them the rest of their lives, that they did not want him to leave home anymore and that if plaintiff would stay, they would buy the east farm and go out there and he could learn farming and when the lease was up on the west tract owned by them, they would move to the place and that all of them would live together and if plaintiff would stay and take care of them, all of their property would be his when they were through with it. Plaintiff agreed to this arrangement.

"4. Both places were occupied by tenants. Thereafter, the east place was purchased and possession was acquired in 1928. Plaintiff moved there in the summer of that year. The parents lived in town but came to see him frequently. The parents acquired possession of their west place in 1929 and moved to the west place and he moved in with them.

"5. In the farming operation, the division of the profits were 50-50, the same as in the monument business. Farm machinery and some livestock were received as payment on accounts receivable, unpaid from the monument business. The second year, there was allocated to the father as his separate property, the cattle, in compliance with a desire he had had for cattle of his own, and there was allocated to plaintiff the hogs as his separate property, with an agreement that plaintiff would look after and feed the livestock. Plaintiff subsequently obtained three horses taken in on indebtedness. The crop division was then changed to one-third of the small grains and two-fifths of the corn and hay to the father with the other fractional parts to the plaintiff. In later years, the father paid one-third of the fertilizer expense. Plaintiff did all of the farm work and looked after the livestock.

"6. Previous to this arrangement, plaintiff had married Bessie Buell on May 9, 1918, and was granted a divorce from her in 1920. He married Helen Soper on June 25, 1921. Two children were born to this union, a daughter and son, now deceased, the daughter and successor issue of the son are parties defendants herein. The parties were divorced in 1927. Controversy over the divorce action and subsequent support money payments and visitation rights resulted in complete estrangement between plaintiff and his children.

"7. Plaintiff thereafter married Mary Thorton on November 12, 1931, and they moved to the east place which was nearby in the adjoining quarter section to where the parents lived on the west place. Her mother resided with them and friction between the mother and plaintiff and plaintiff's father resulted in plaintiff obtaining a divorce from her in November, 1935.

"8. Plaintiff's mother became ill in 1932 which became progressively worse and required her to enter a hospital at Kansas City, Missouri. She was in the hospital from June until August 16, 1935, when she died, during the time

plaintiff and father alternated spending a week at a time with her. The last Sunday before her death, plaintiff's mother told him she was not going to get well and that she wanted him to have the Elrod money, referring to an inheritance from her parents, and gave him a blank check, signed by her for that purpose, on the bank in which the money was deposited.

"9. About a week after the funeral of his mother, plaintiff informed his father concerning the check and that he was going to the bank to see how much was in the account. His father then informed plaintiff that both were hard up and had nothing to bury the mother with and that he had the account transferred to his name. He further told plaintiff that it doesn't make any difference, that under their agreement, everything was going to plaintiff, that plaintiff had taken care of his mother and he was satisfied plaintiff would take care of him. The amount in the account at the time of withdrawal was $1,795.11. The estate of the deceased had been increased by such amount.

"10. At about the time the plaintiff divorced his wife in 1935, he moved in with his father at the west place and thereafter lived with his father until November, 1952. The plaintiff did the housework and cooking, bought the groceries and provided his father with such care as he needed, except on occasions when he himself was absent because of his own illness or hospitalization during which times he arranged with the neighbors to see that his father was in satisfactory condition. During portions of this period, housekeepers were employed, but they did not stay long because of the inability to please the father. The housekeepers were paid by the father from his funds. Plaintiff was married to Edith Westfall, his present wife, on April 25, 1952, and they lived at the west farm home together with the father. Plaintiff provided the father with good care until the father later left.

"11. During all of the period on the farm, the father performed only such minor tasks as he desired for his own interest. He followed the normal activities of a person of his age. He was involved in an automobile collision on June 19, 1940, at the age of 70 years. At this time, he sustained a severe brain concussion, three fractured ribs, laceration of the left ear resulting in the loss of about ⅔ of the left external and contusions and sprains. After this occurrence, the father's mental and physical condition showed a deterioration and a gradual decline thereafter. This increase commencing in about the year 1946. He was admitted to the hospital on January 13, 1950, with a diagnosis of acute sinobronchitis and senility. He had been previously admitted to the hospital in 1940 with a diagnosis of heat exhaustion and arteriosclerosis, generalized and in 1948 with a diagnosis of corneal abrasion, conjunctivitis and senile cataracts. He had the cataracts removed in 1950. Plaintiff provided 19 days nursing service at the hospital at that time because there was no third nurse available. Occasionally the father had illnesses when at home, during which time plaintiff gave him the prescribed medicines. On some occasions he would wander away from home and have to be gone after.

"12. On February 11, 1952, the father sustained severe first, second and third degree burns as a result of a grass fire, which he had set and which

required his hospitalization until May 25, 1952. On his release, he returned to the west place with plaintiff.

"13. In November, 1952, the father had a 'mad spell' and left the farm home. He went to the home of his sister in Winfield, where he stayed for a few days, after which he went to stay at a boarding house operated by Mrs. Ida Beeman. Plaintiff asked him to return to the farm home, but he would not do so.

"14. Prior to February, 1953, the father handled his own bank account, rental property and his personal and business affairs. On February 2, 1953, the plaintiff filed a petition for the appointment of a guardian for the person and estate of his father and nominated a non-relative for the appointment. On February 11, 1953, the father was adjudged incompetent and the court appointed M. F. Jarvis, a Winfield banker, guardian of his person and estate, who served until his death on September 30, 1957, after which plaintiff was appointed as successor guardian and duly qualified as such on September 30, 1957. Beginning in 1957, the guardian felt that the father should be removed to a rest home because of more adequate facilities and this was done. In May, 1959, plaintiff moved his father to a room in a hospital in response to a call from the rest home that he had fallen and was bleeding. He was continued in the care of the hospital until his death on December 6, 1960, at the age of almost 91 years. During the period of the guardianship of Mr. Jarvis, plaintiff conferred with him concerning his father's welfare and visited his father at regular intervals weekly, during his stay away from the farm home. During all of the period at the boarding house, rest home and hospital, the costs and expenses were paid from the father's funds. During the entire period from adjudication of the incompetency of the father until his death, plaintiff accounted for and paid to the guardian of the father all of the division of the crops due the father.

"15. In statements and admissions to neighbors Charles T. Roberts confirmed the contract he and his wife had with his son, the plaintiff.

"16. By a will dated September 8, 1950, Charles T. Roberts bequeathed $1,000.00 each to his two grandchildren and devised a life estate in his residence property in Winfield to his sister with remainder to his grandchildren, and devised and bequeathed the rest and residue of his estate to his son, the plaintiff, and nominated him as executor.

"By a will dated September 13, 1950, he revoked all previous wills and gave all of his property to the plaintiff and nominated him as executor.

"By a will dated August 24, 1951, he revoked previous wills and bequeathed and devised all of his estate to plaintiff, except a life estate to his sister, in the Winfield residence about [sic] referred to, and nominated plaintiff as executor.

"By a will dated August 5, 1952, admitted to probate in this estate, he revoked all previous wills and bequeathed $1,000 each to his two grandchildren, devised a life estate to his sister in the Winfield residence referred to above, with remainder to the said grandchildren and devised and bequeathed to plaintiff a life estate in the rest and residue with remainder therein to said grandchildren.

"17. Plaintiff substantially performed all the provisions of the contract on

his part to be performed until November 22, 1952, which he was prevented from doing thereafter because his father left the premises. What was done by plaintiff after such date with reference to his father is not attributable to the contract. The contract was not fully performed by the plaintiff.

"18. Prior to decedent's death, plaintiff expended his labor and his own money in the furnishing of materials in construction and additions to buildings, erection of fences and making of lasting and valuable improvements on the real estate of the value of $6,500.00.

"19. After the death of the father and on March 21, 1961, plaintiff made final settlement of his accounts as Guardian and was allowed and accepted a fee of $1,500.00 for his services as guardian and was discharged as such.

"20. Plaintiff was sole petitioner in Petition for Probate of Will filed February 8, 1961, and was appointed and qualified as executor and was issued letters testamentary on March 3, 1961. Notice of Appointment was first published March 4, 1961. On November 16, 1961, he petitioned to be discharged as executor, filed accounting and was discharged as such on November 28, 1961. In his petition he asked for allowance of fee and on hearing allowance was reserved to a later date.

"21. The total estate of Charles T. Roberts, deceased as shown by the inventory and appraisement consisted of real estate of the value of $33,100.00 and personal property of the value of $17,047.97 and in aggregate, $50,147.97.

"22. On November 30, 1961, plaintiff appealed from the order of the Probate Court admitting the will of Charles T. Roberts to probate and thereafter prosecuted such appeal to its unsuccessful conclusion. [See *In re Estate of Roberts,* supra.]

"23. On December 1, 1961, plaintiff filed in the Probate Court Petition for specific Performance of Oral Contract to Bequeath and Devise, on which the claim here has been tried."

"CONCLUSIONS OF LAW

"1. Plaintiff and his parents entered into a contract on the terms set out in findings No. 3 and the same is established by clear and convincing evidence.

"2. Specific performance of the contract would be inequitable.

"3. The estate of Charles T. Roberts, deceased, has been unjustly enriched in the amount of $1,795.11 of the mother's inheritance account intended for plaintiff and of expenditures of money and labor by plaintiff on the farm real estate of the value of $6,500.00. A constructive trust in favor of plaintiff in the amount of $1,795.11 is imposed and impressed upon the personal property in said estate passing to the legatees of said Charles T. Roberts, other than the plaintiff. A constructive trust in favor of plaintiff in the amount of $6,500.00 is impressed and imposed upon the farm real estate passing to the devisees of said Charles T. Roberts, other than the plaintiff.

"4. The contract is not in violation of the statute of frauds.

"5. Plaintiff is not estopped from making his claim by his acts and conduct in connection with the decedent's estate.

"6. The remedies pursued are not inconsistent, constituting an election of remedies.

"7. Plaintiff is not estopped by petitioning for allowance of compensation.

"8. Plaintiff is not estopped by accepting proceeds from the farm as fiduciary or an individual.

"9. Judgment should be entered in acordance herewith."

On April 19, 1966, judgment was entered in harmony with the foregoing findings of fact and conclusions of law.

At the outset, we are not confronted with the question whether the evidence established the contract; the district court concluded it was established by clear and convincing evidence. The plaintiff contends that conclusion of law No. 2 denying specific performance is not supported by the findings of fact and that when considered in their entirety, they require a reversal, entitling him to a decree of specific performance of the contract.

Do the findings establish a sufficient performance by the plaintiff to satisfy the demands of equity and good conscience, or should he be denied the remedy and relegated to the position of attempting to prove monetary compensation based on his own valuation of his services under the oral contract? Our many decisions involving cases of this character are to the effect that whether equity will decree specific performance of a contract rests in judicial discretion and always depends upon the facts of the particular case. As a general rule, when a contract to leave property by will has been established by clear and convincing evidence, and there has been performance on the part of the promisee, equity will grant relief, if there is no objection on account of inadequacy of consideration and there are no circumstances which render the claim inequitable. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743; *Smith v. Cameron*, 92 Kan. 652, 657, 141 Pac. 596; *Berry v. Davenport*, 106 Kan. 393, 188 Pac. 223; *Greiner v. Greiner*, 131 Kan. 760, 293 Pac. 759; *Craig v. Sanders*, 133 Kan. 97, 298 Pac. 792; *Troutfetter v. Backman*, 165 Kan. 185, 193 P. 2d 201; *In re Estate of Witte*, 174 Kan. 360, 255 P. 2d 1039, 36 A. L. R. 2d 717.)

As indicated, inadequacy of consideration is not involved—the plaintiff was denied relief upon the ground specific performance of the contract would be inequitable. What express findings of the district court, or facts reasonably inferable from findings specifically made, support that conclusion? We find none. On the contrary, the district court concluded the plaintiff was not estopped from making his claim by reason of his acts and conduct in connection with the decedent's estate, and that the remedies he pursued were not inconsistent.

The detailed findings of fact clearly establish that what the plaintiff contracted to do was of a peculiar, intimate and personal nature.

He changed his mode and place of living, gave up his freedom of action as an experienced and employable salesman and became an apprentice farmer in the depression days. He was 31 years of age when the contract was entered into in the summer of 1928, and it was performed according to its terms by the parties until late November, 1952, a period of more than 24 years which included the lifetime of the mother, Stella Roberts, who died in 1935. No contention is made the plaintiff did not stay on the farm and take care of his parents—the findings are that in sickness and in health, the plaintiff provided his father with good care until he had a "mad spell" in November, 1952, and left the farm. At that time he was approximately 83 years old. Despite the plaintiff's urging to return home, he declined to do so. Four months later, the father was adjudged incompetent and the record implies the cause of his leaving the farm home was due to an increased acceleration of a deterioration and decline in his mental and physical condition, which commenced about the year 1946.

Is the plaintiff to be denied his remedy after long years of service and performance without fault on his part because further performance of the contract was rendered impossible due to the father's mental and physical condition necessitating his being adjudged an incompetent? We think not.

As indicated, the contract was entered into the summer of 1928 and was for the lifetime of the plaintiff's parents. This covered a span of approximately 32 years. No claim is made the contract was not fully performed insofar as the mother was concerned, nor is it contended that during the 24 years the father lived with the plaintiff at the farm home the contract was not satisfactorily performed. It thus appears the crucial period in the litigation which compelled the district court to conclude enforcement of the contract would be inequitable was the eight-year period after the father left the farm home and the events which occurred during that time. During that period the father was adjudged incompetent and the costs of his care and maintenance at the boarding home, the rest home and the hospital were paid from his funds rather than by the plaintiff.

When Mr. Jarvis was appointed guardian of the person and estate of the incompetent father on February 11, 1953, he was subject to the control and direction of the probate court of Cowley County at all times and in all things. As guardian of the person, he had charge of the person of the ward, and as guardian of the estate, he was required to take possession of and manage the ward's

real and personal property and to pay the reasonable charges for his support and maintenance from his estate. (K. S. A. 59-1804, 59-2267.) Generally speaking, the guardian of an insane or incompetent person has the right to the custody and control of the person of his ward (25 Am. Jur., Guardian and Ward, § 64, p. 43), and in determining where the ward shall live, the safety and welfare of the incompetent is regarded as a matter of primary importance. (See, Anno. 131 A. L. R., pp. 290, 291.)

During the guardianship, the plaintiff conferred with Mr. Jarvis concerning his father's welfare and visited him regularly at the boarding home. No effort was made by the guardian to return the father to the farm home, presumably because his needs and welfare demanded otherwise, nor did the guardian attempt to disaffirm the contract with the plaintiff. After the plaintiff was appointed guardian in 1957, he placed his father in a rest home, and in May, 1959, the physical needs of his father required that he be placed in a hospital. But the plaintiff, like Mr. Jarvis, was subject to the control and direction of the probate court at all times and was required to pay the reasonable charges for his father's care and maintenance from his estate. Moreover, during the entire period from the time his father left the farm home until his death on December 6, 1960, at the age of almost 91 years, the plaintiff remained on the farm and continued his performance of the contract; he farmed the land, tended the livestock, and produced the income which in whole or in part provided for his father's care and maintenance under the guardianship. Equally important is the fact that during this period the plaintiff accounted for and paid to the guardian the rents and profits on the same basis which existed when the father lived with the plaintiff on the farm.

When the findings are examined in light of all the surrounding circumstances and what is disclosed regarding the relationship of the parties, we think the plaintiff had the right to continue to perform the contract and pay over to the guardian the father's share of the rents and profits. Manifestly, it would be unreasonable to hold the rights of the plaintiff under the contract were forfeited or changed by reason of the father's being adjudged an incompetent necessitating the guardian to pay the costs of his care and maintenance from his estate rather than by the plaintiff. While factually dissimilar, see, *Taylor v. Taylor,* 79 Kan. 161, 99 Pac. 814, and *Smith v. Smith,* 109 Kan. 584, 201 Pac. 75.

In denying specific performance of the contract the district court

relied upon the rationale of *Bahney v. Gross*, 135 Kan. 446, 10 P. 2d 844. As indicated, whether equity will decree specific performance of a contract rests in judicial discretion and always depends upon the facts of the particular case. The findings here involved are clearly distinguishable from the *Bahney* case. There, the promisee received compensation in money each month from the promisor. For this and other reasons, we think the *Bahney* case is not controlling.

The record discloses that the "west place" where the plaintiff lived during most of the period of the contract is the family homestead. He made lasting and valuable improvements to all the real estate, which the district court found to be of the value of $6,500, which fact is often given great weight in decreeing specific performance.

The contract being established by clear and convincing evidence, we are of the opinion the plaintiff cannot be compensated in money, and the record discloses no reason why equity and good conscience should not direct specific performance. Conclusion of law No. 2 is clearly not supported by the findings of fact, and those findings in and of themselves require a reversal of the judgment. The district court is directed to enter a decree of specific performance of the contract as found to exist in findings of fact No. 3.

It is so ordered.

FONTRON, J., dissenting: My colleagues concede that whether equity will decree specific performance of a contract rests within the sound judicial discretion of the court and depends on the particular facts of a given case. The judicial discretion thus to be exercised is lodged, in the first instance, in the trial court.

It has been our invariable rule that a trial court has wide discretion in exercising its equitable powers, and that its judgment will not be disturbed on appeal in the absence of an abuse of discretion. (*Gillet v. Powell*, 174 Kan. 88, 254 P. 2d 258, see, also, 1 Hatcher's Kansas Digest (Rev. Ed.) Appeal & Error, §§ 444-465.)

In the present case the trial court concluded, on its own findings of fact, that it would be inequitable to grant specific performance of the contract which it had under consideration. In my opinion, it can not be said that the trial court, in coming to that conclusion, abused the discretion with which it was vested, in view of the facts which it found to exist. To so hold, as I view it, would simply substitute the judgment of this court for that of the trial court, and

on facts from which differing conclusions might well be drawn.

In concluding it would be inequitable to grant specific performance of the contract in this case, the trial court relied largely on the decision in *Bahney v. Gross*, 135 Kan. 446, 10 P. 2d 84. Although this court now holds that *Bahney* is clearly distinguishable from the present case, the difference, in my judgment, is one of degree, not one of kind.

Performance on the part of the plaintiff, in *Bahney*, was alleged to be for about half the time which elapsed between the making of the contract and the promisor's death. Here, the plaintiff performed his part of the contract for approximately seventy-five percent (75%) of the elapsed time. In *Bahney*, as in the present case, it was argued that the promisor had prevented full performance by leaving the home of the promisee. This contention was answered by the court when it said this fact would not entitle the promisee to specific performance as though he had fully performed, but would entitle him to file a claim against the estate for services.

Factors which the trial court may have had in mind in weighing the equities and in refusing specific performance might well have included the eight-year period during which the plaintiff did not perform the contract, no matter what the reason; that those eight years were the last and doubtless the most demanding years of his father's existence; that during most of those years, the old gentleman was under guardianship, and his son made no effort to bring him home; that for the last four years the claimant, himself, was guardian but left his father in rest homes or in hospitals; that Mr. Roberts always paid his own way, and that his son paid all expenses for his father's care from his father's own funds; that plaintiff asked for and received a generous guardian's fee; that plaintiff petitioned for probate of his father's will and served as executor thereof nearly nine months, for which services, he has petitioned for allowance of a fee.

From these facts alone, all of which were before the trial court as indicated by its findings, I believe the court, without abusing its discretion, might well have considered specific performance to be inequitable. Whether the plaintiff would be entitled to recover for services on a *quantum meruit* basis is not before the court at this time.

I would affirm this judgment and, for that reason, I respectfully dissent.